FIRST NATIONAL REALTY CORPORATION *v.*
STATE ROADS COMMISSION OF
MARYLAND

[No. 49, September Term, 1969.]

*Decided November 12, 1969.*

---

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Hal C. B. Clagett,* with whom were *Thomas A. Farrington* and *Sasscer, Clagett, Powers & Channing* on the brief, for appellant.

*Carl Harrison Lehmann, Special Attorney,* with whom were *Francis B. Burch, Attorney General,* and *Joseph D. Buscher, Special Assistant Attorney General,* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This case is a reprise of the controversy which was before us in *First National Realty Corp. v. State Roads Comm'n,* 247 Md. 709, 234 A. 2d 577 (1967) where we reversed the judgment entered in a condemnation case in the Circuit Court for Prince George's County and remanded the case for further proceedings.

In that case, the record showed that State Roads Commission (the Commission), which proposed to take 1.28 acres in fee and .13 acre in revertible slope easements for road widening purposes from a tract of nearly 70 acres on Greenbelt Road in Prince George's County, had filed plats on 10 November 1961 and had deposited in court an amount equivalent to its valuation of the property which it was taking from First National Realty Corporation (First National). On 5 September 1962, First National timely filed its notice of dissatisfaction with the award made by the Board of Property Review. The Commission did not institute condemnation proceedings within 30 days of 5 September, but itself filed a notice of dissatisfaction on 13 September and filed a petition for condemnation within 30 days of 13 September.

We reversed, holding that because the Commission had neither acquired title to the condemned property within one year from the day of recording the plat nor filed a condemnation suit within 30 days of the filing of the notice of dissatisfaction by First National, the time of valuation of the property should have been the time of trial and not, as the lower court had ruled, the time when the plat was recorded. In so holding, we relied on Maryland Code (1957, 1964 Repl. Vol.) Art. 89 B § 18; on Maryland Rules U 27 f 1 and 2, and on *State Roads Comm'n v. Orleans,* 239 Md. 368, 211 A. 2d 715 (1965) and *Volz v. State Roads Comm'n,* 221 Md. 209, 156 A. 2d 671 (1959).

First National, dissatisfied with the amount of the judgment entered in its favor in the trial of the case on remand, has appealed. First National argues that the judgment should be reversed, because the jury's verdict was tainted by certain evidence improperly adduced at the trial which had the effect of frustrating our prior holding that valuation of the property must be that at the time of trial and not at some earlier date.

First National assigns as error:

    i. The court's admission of evidence as to the purchase price of the property.

    ii. The court's refusal to strike the testimony of the Commission's expert witness, because he failed to cite comparable sales.

    iii. The court's allowing the Commission to impeach the testimony of an adverse witness.

Because we find no prejudicial error in the record, taken as a whole, *State Roads Comm'n v. Kuenne,* 240 Md. 232, 235, 213 A. 2d 567 (1965); *Hance v. State Roads Comm'n,* 221 Md. 164, 176, 156 A. 2d 644 (1959), we shall affirm.

i.

First National complains that its president, Sidney J. Brown, called by the State as an adverse witness, was permitted to testify over strenuous objection:

"Q. Mr. Brown, when did you purchase this subject property?

(Mr. Clagett [counsel for First National]) : I object.

(The Court) : Overruled.

(The Witness) : The property was purchased in December of 1959.

By Mr. Lehmann [counsel for the Commission] :

"Q. From whom did you purchase it?

"A. It was purchased from Harry Boswell, Jr., and Sr., Philip Lustine and A. H. Smith.

"Q. How much did you pay for it?

(Mr. Clagett) : I object.

(The Court) : Overruled.

\* \* \*

(The Witness) : The property sold for, as I recollect, something in the neighborhood of five hundred and —$550,000, I believe."

Mr. Brown was then permitted to testify on cross-examination, over the Commission's objection, that subsequent to the purchase, First National spent $3,000,000 on site preparation and $6,000,000 on improvements.

We do not believe that the admission of Brown's testimony regarding original cost was error. Whatever probative value it might have had was tempered when Brown was permitted to testify as to subsequent expenditures, and by the testimony of the experts produced by both parties. To the extent that it was not, the court's instruction left the jury in no doubt about the weight to be given it:

"Well, the law recognizes that you can take the property as a whole, a little less than eighty acres, and you put a value on the whole thing before, including this strip that they are taking, and then you put a value on the whole thing minus the strip. The difference between the

two should be the value of the strip. So that is the approach.

"You note I said the market value of this property first, before, including the strip, and the property minus the strip. Market value each time. Well, the next thing is the market value as of when? There has been a lot of bickering back and forth, and so forth, about all these dates. *I tell you as a matter of law as of today, December the 10th, 1968; that is the date you are dealing with.*

"What do I mean by market value? In other words, when I say 'market value' what do I mean? Well, it means simply what a buyer, willing but not compelled to buy,—there is nothing making him buy this particular piece of property, but he is willing to buy it—would pay for it; and which a seller, willing but not compelled at some forced sale with the sheriff looking down his throat or something, — not compelled to sell but willing to sell—would take for it. In other words, it is what would it bring on the market when there exists this willing seller and willing buyer and dealing fairly, uncoerced by any outside force, what would it bring in that situation *and what would it bring today, December the 10th, 1968*.

"But there is another factor you have to take into account. It is what would be the fair market value before and after, that is, with and without this strip being deducted from it, as of today's date, but creating no increased value because of this dualization project itself. In other words, even though you view it as of today you have got to use the legal fiction or magic that instead of the dual road being there it is the two-lane road of whatever width it was prior thereto, if you feel that the dualization project increased it in and of itself." (emphasis added).

But even assuming, *arguendo,* that the admission of the evidence was error we do not think that this would justify a reversal. As Judge Prescott, speaking for this Court in *Hance v. State Roads Comm'n,* 221 Md. 164, 156 A. 2d 644 (1959), said:

> "Courts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice. This is especially true in condemnation proceedings. Such cases usually consume much time in trial, and are expensive in nature. As a rule, they are determined by a myriad of different items of evidence. The exclusion or admission of small items of evidence of doubtful materiality are not likely to be of great importance in the outcome of the case, and most courts refuse to set aside a verdict in cases of this kind, for error in the rulings on questions of evidence, unless, as indicated above, substantial prejudice be shown. \* \* \*." 221 Md. at 176.

See also *State Roads Comm'n v. Kuenne,* 240 Md. 232, 235, 213 A. 2d 567 (1965). No such prejudice has been shown to exist in this case.

### ii.

First National's second point is that the court erred in refusing to strike the testimony of the Commission's expert witness, John Frederick Wormcke, because of his failure to substantiate his testimony by showing that he had knowledge of comparable sales.

Wormcke testified, in his direct examination, that he had been an appraiser for 13 years; described the courses which he had taken, outlined his experience in appraisal work and detailed his appearances as an expert witness. Over objection, he defined fair market value:

> "Well, the fair market value for condemnation shall be the price as of the valuation date

for the highest and best use of such property which a seller, willing but not obligated to sell, would accept for the property, and which a buyer, willing but not obligated to buy, would pay therefor excluding any increment in value proximately caused by the public project for which the property condemned is needed.

"Now, my interpretation is that you must have the willing buyer and willing seller, but you also must exclude or take out any increment, any increase."

\* \* \*

"The willing buyer and willing seller concept, but excluding any increment in value, taking out any increase in value proximately caused by the public improvement for which the condemnation is needed."

No question was raised by First National as to Wormcke's professional qualifications, nor was he cross-examined on them, except as respecting his definition of fair value.

Counsel for the Commission then proceeded to question him as to the value of the property taken. The essence of his testimony before the jury, which was unduly extended by repeated objections and interrupted by an examination of the witness out of the presence of the jury, was that the damages sustained by First National as a result of the taking by the Commission, but determined as of the date of trial, were $19,820.00, which he arrived at by deducting the value which he attributed to the property after the taking, $741,213, from his estimate of value before the taking, $761,033, excluding, in each case, the enhancement in value attributable to the dualization of Greenbelt Road. There is no doubt that Wormcke's opinion was based on value at time of trial, adjusted for enhancement as prescribed by our holdings in *Hance v. State Roads Comm'n, supra,* 221 Md. at 176; *Congressional School of Aeronautics, Inc. v. State Roads*

*Comm'n,* 218 Md. 236, 146 A. 2d 558 (1958) and *Bonaparte v. Mayor & City Council of Baltimore,* 131 Md. 80, 101 A. 594 (1917).

When pressed on cross-examination for comparable sales, Wormcke said, "Well, I might answer you this way, by saying that there is no such thing as a sixty-eight acre parcel of land located on a two-lane road." In the context of his testimony, what the witness was saying was that he had found no sales of large tracts zoned for industrial use located on two-lane roads, as the First National property had been, which had been bought for commercial purposes. He was prepared, but was not permitted to testify as to three smaller tracts, zoned industrial, and sold for industrial purposes.

In making the contention that Wormcke's opinion, unsupported by testimony as to comparable sales, should be stricken because it was not "substantiated by any supporting facts," First National has overlooked a facet of our legal history. It was not until *Mayor & City Council of Baltimore v. The Smith & Schwartz Brick Co.,* 80 Md. 458, 31 A. 423 (1895) that testimony as to prices realized for sales of similar land in the vicinity of that to be condemned was held to be admissible in a condemnation case.[1] This Court, speaking through Judge McLaughlin in *Turner v. State Roads Comm'n,* 213 Md. 428, 132 A. 2d 455 (1957) traced the history:

"The case of *Baltimore v. Brick Co.,* 80 Md. 458, 472, was the first case in Maryland to enunciate the law that prices realized for sales of similar land in the vicinity of that to be condemned were admissible before a jury trying to ascertain its value. The Court in this case said: 'It is generally conceded that the opinions of witnesses having sufficient knowledge on the subject and acquainted with the land in question, are admissible to prove such value; and that the

---

1. An earlier intimation can be found, however, in *Moale v. Mayor & City Council of Baltimore,* 5 Md. 314 at 324 (1854).

question as to whether a witness is qualified to give an opinion must be left, in a large measure, to the discretion and judgment of the trial Court, but of course that discretion is not without limit. * * * We think, therefore, that the prices realized at sales of the land in question and of similar land in its vicinity, made within a reasonable period of time theretofore, * * * are admissible in evidence * * *.' Since this holding it has long been the custom that before real estate experts can give opinions of land values such witnesses must qualify by showing they have knowledge of comparable sales; that is, they should know what similar land was selling for in the neighborhood before or at the time it was condemned. Knowledge of comparable sales is not the only test of the qualifications of a real estate expert, but is certainly a helpful one in determining competency." 213 Md. at 433.

While we now routinely encounter testimony as to comparable sales in condemnation cases, it is important to remember that this is not the *only* way that the qualification of an expert may be established.

"It has been said, however, that the probative weight of valuation evidence that is otherwise well qualified is not destroyed nor necessarily reduced to a mere scintilla by the inability of the witness to cite an instance in which comparable property has actually sold at a price that would support his opinion. The net weight of the testimony is for the jury to determine." *5 Nichols on Eminent Domain,* 3d Ed. § 21.3 [2] (1969 Supplement); *Commonwealth Dept. of Highways v. Baston,* 371 S.W.2d 869 (Ky. 1963).

Nor is it always essential that opinion witnesses have

knowledge of specific sales. 3 Wigmore, *Evidence,* 3d Ed. (1940) § 714; *Montana Ry. Co. v. Warren,* 137 U. S. 348, 11 S. Ct. 96, 34 L. Ed. 681 (1890) ; *Lyons v. United States,* 99 F. Supp. 429 (W.D. Pa. 1951) ; *Damron v. Bartley,* 302 Ky. 83, 194 S.W.2d 73 (1946).

In the case before us, Wormcke testified as to his qualifications and experience at length, and without objection. His failure to testify as to comparable sales, as Judge Digges pointed out, went to the weight, and not to the admissibility of his testimony, *Hance v. State Roads Comm'n, supra,* 221 Md. at 168; *Mayor & City Council of Baltimore v. Hurlock,* 113 Md. 674, 683, 78 A. 558 (1910). The question of whether he was competent to give an opinion was within the discretion of the trial court, whose determination will not be disturbed, unless there has been an error of law or an abuse of discretion. 2 Jones, *Evidence,* 4th Ed. (1938) § 369; *Turner v. State Roads Comm'n, supra,* 213 Md. at 433-34.

We find no reason to disturb the court's refusal to strike Wormcke's testimony.

### iii.

First National contends that it was error for the court to permit the Commission to impeach the testimony of Mr. Brown, the President of First National, whom the Commission had called as an adverse witness, relying on Code (1957, 1965 Repl. Vol.) Art. 35 § 9. After his testimony as to original cost of the property, to which allusion has been made, he was cross-examined by First National's counsel. During the course of this, he was permitted to testify, over objection by the Commission, as to the amounts spent on site preparation and the cost of improvements. On redirect examination, he was asked about the use originally projected for the strip taken in condemnation and said that it would have been used "for parking purposes or possibly for other buildings." Then there was the following exchange :

> "Q. As a matter of fact, Mr. Brown, isn't it a fact that from the time you purchased the

property you were in negotiations with the State Roads Commission to make certain changes in the planned widening and dualization of Greenbelt Road, isn't that correct, from the time that you purchased the property until it was actually constructed? A. That is not correct, sir.

Q. Did you enter into any negotiations with the State Roads? A. At some later time we needed entrances and exits and we negotiated about it.

Q. When was this? A. I would say that it would have been somewhere around 1962 or '63.

Q. In 1962 or 1963? A. Maybe four years after we acquired the property.

Q. Four years after you acquired it? A. No. Three years. '59, I'm sorry."

Later in the trial, Charles Lee, an official of the Commission, whose testimony had been proffered and excluded during the presentation of the Commission's case, was called for the purpose of impeaching Mr. Brown's testimony that negotiations with the Commission with respect to entrances and exits for the property had commenced in 1962 or 1963. Without reviewing Lee's testimony in detail, he testified over objection that the Commission's first contact with Brown was in 1960.

First National complains that this was a maneuver, designed to get before the jury by indirection testimony which it had not been permitted to offer as a part of its case in chief. The Commission counters with the contention that Code, Art. 35 § 9 permits the officer of a defendant corporation to be called as an adverse witness, to be interrogated by leading questions, to be contradicted and to be impeached, and that if Brown's testimony had not been rebutted, the Commission would have been bound by it, referring us to *Larsen v. Romeo,* 254 Md. 220, 225, 255 A. 2d 387 (1969) and cases there cited. We think that the Commission has the better of

616

the argument and that Lee's testimony was properly admitted.

Finding no error, we shall affirm the judgment entered below.

*Judgment affirmed, costs to be paid by appellant.*