468 A.2d 92

**Diane HAINES**

v..

**Allen SHANHOLTZ.**

**No. 210 Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Jan. 6, 1984.

Certiorari Denied June 7, 1984.

Joseph B. Spillman, Asst. Atty. Gen., with whom was Stephen H. Sachs, Atty. Gen., William R. Hymes, State's Atty., for Howard County, Sharon A.H. May, Asst. State's

Atty., for Howard County and Arnold V. Hawkins, Staff Atty., on the brief, for appellant.

Charles M. Preston, Westminster, with whom were William F. Brown and Stoner, Preston & Boswell, Chartered, Westminster, on the brief, for appellee.

Argued before WEANT, ALPERT and GETTY, JJ.

GETTY, Judge.

Justice William J. Brennan, Jr., as a Judge of the Appellate Division of the Superior Court of New Jersey, stated in *Cortese v. Cortese,* 10 N.J.Super. 152, 76 A.2d 717 (1950):

"In the field of contested paternity ... the truth is so often obscured because social pressures create a conspiracy of silence or, worse, induce deliberate falsity.

The value of blood tests as a wholesome aid in the quest for truth in the administration of justice in these matters cannot be gainsaid in this day. Their reliability as an indication of truth has been fully established."

## BACKGROUND

Article 16, Sec. 66G was first adopted by the Maryland Legislature in 1941, some forty-one years after Dr. Karl Landsteiner announced the results of his experiments establishing that all persons, without regard to race or sex, could be divided into three blood groups (later, four groups). Our statute remained virtually unchanged until the enactment of Chapter 784 of the 1982 Laws of Maryland, effective July 1, 1982.

Prior to the 1982 amendments, blood test results were admitted into evidence in paternity cases only if the tests performed *excluded* the putative father of a child. The restrictive use of test results in paternity cases was based upon the acknowledged fact that the "red cell" testing being performed at that time did not provide sufficient information to be of probative value in affirmatively establishing paternity.

The Maryland Legislature held hearings in 1981 and in 1982 before adopting the present statute. One of the witnesses who testified before the Legislature was Mrs. Margaret Brooks, Supervisor of the Red Cell Lab at the Baltimore RH Typing Laboratory. Mrs. Brooks's testimony before the Legislature included a discussion of the development of a test system known as Human Leukocyte Antigens (HLA) which detects HLA markers, or antigens, on white blood cells. Used in conjunction with "red cell" testing, HLA produces markedly higher probabilities in paternity studies. The HLA system was originally developed to avoid rejections in organ transplants. Additionally, the system has been in use for paternity studies for many years in Europe and has been adopted for paternity studies in twenty-seven states in the United States.

The American Medical Association and American Bar Association Joint Guidelines list sixty genetic markers as recognizable characteristics inherited from parents and strictly controlled by genes on a pair of chromosomes. Of the sixty markers, approximately twenty are in general use. Testing laboratories use a combination of the genetic markers that will produce the highest probability of exclusion percentage consistent with reasonable cost. The HLA testing alone produces a 92 percent mean probability of exclusion of non-fathers. HLA testing of both red and white cell antigens, in combination with six of the remaining genetic markers produces the 97.3 percent figure adopted in the 1982 amendment to Art. 16, Sec. 66G.[1]

The Maryland Legislature, by enacting Chapter 784 of the 1982 Laws of Maryland, recognized the advances made in the science of genetic testing and authorized a new proceeding in which blood test results could be utilized in paternity cases, in which exclusion is not established, if the results are sufficiently extensive to exclude 97.3 percent of putative fathers who are not biological fathers and where the statisti-

---

**1.** Source of background material, testimony presented to Senate Judicial Proceedings Committee.

cal probability of the alleged father's paternity is at least 97.3 percent. The present statute, in pertinent part, reads as follows:

" . . . The test results may be received in evidence in cases where definite exclusion is established, and in cases in which exclusion is not established, if testing was sufficiently extensive to preclude 97.3 percent of putative fathers who are not biological fathers, and the statistical probability of the alleged father's paternity is at least 97.3 percent. The tests shall be made in laboratories selected by the court from a list provided by the Child Support Enforcement Administration of the Department of Human Resources. Reports of such tests shall be made by such laboratories in writing and in the form required by the court . . . . The reports, when admissible in evidence, shall be accepted as prima facie evidence of the results of such tests . . . . When the tests are admitted in evidence, the laboratory technicians who made them are subject to cross-examination by all parties to the proceedings . . . . "

The legislation enacted in 1982 carefully refrained from adopting any specific tests to establish the percentages necessary to include or exclude putative fathers. It is reasonable to assume that the General Assembly recognized that new technology may become available and, by not addressing any specific combination of tests, laboratories will be allowed to utilize the most effective tests without further legislative change.

■ The legislative intent in adopting the present statute was to protect illegitimate children through court ordered support based upon sophisticated and reliable genetic testing. The high percentages of probability of paternity established by the testing, moreover, facilitate settlement of the issues without the necessity of proceeding to trial. Thus, the expense and time invested in a trial may be avoided, the likelihood of false testimony by either side is diminished, and paternity is reliably established.

## THE PRESENT CASE

On July 28, 1981, Diane Haines, the appellant herein, filed a paternity petition alleging that Allen Shanholtz, appellee herein, is the father of her infant daughter. Appellee denied that he had ever had sexual relations with appellant and requested, to his eventual dismay, a blood test. The results of that test indicated a 98 percent probability that appellee was the father. Appellee promptly reversed his field and argued that the test results were inadmissible, because the appellant could not establish that the test results were generally accepted in the scientific community as being reliable. The trial judge concluded that the tests were not admissible, because the appellant had not satisfied the test for the admission of scientific evidence set out in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), adopted by the Court of Appeals in *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978). Accordingly, the report was not admitted into evidence and the jury returned a verdict for the appellee.

■ In *Reed,* (voice print), authored by Judge Eldridge, the court stated that a trial court may take judicial notice of the reliability of a scientific technique if it is generally accepted in the scientific community. Included therein are ballistics tests, fingerprint identification and blood tests. If a scientific process is generally recognized as being experimental, a trial court may take judicial notice of the lack of acceptance thereof. Where reliability cannot be judicially noticed, resort is made to testimony, legal and scientific articles, and other publications which bear on the degree of acceptance a particular process has achieved.

■ Initially, we believe that the trial court should not have engaged in a determination of scientific acceptance of genetic testing for establishing paternity. The distinction between *Reed* and the present case is that here, unlike *Reed,* the Legislature has expressly recognized the reliability of genetic testing by the adoption of Chapter 784, Acts of 1982, effective July 1, 1982. We believe that this legislative recognition relieves the proponent of scientific evidence of

the burden of introducing the validity issue. *See The Admission of Scientific Evidence—Frye v. United States—A Half Century Later,* 80 Columbia Law Review 1197 (1980). The statute, Article 16, Sec. 66G, furthermore, provides that all parties shall have the right to cross-examine the laboratory technicians who conducted the tests. The legislative intent is clear—genetic testing is valid, subject to cross-examination of those responsible for performing and evaluating the tests. The trial judge has the discretion of admitting testimony that may have a bearing on the *weight* of the testimony offered as to the genetic testing, but not, by reason of the statute, as to the admissibility *vel non* of genetic testing to establish paternity. We hold, therefore, that the refusal of the trial court to admit the test results was error.

■ Assuming for the purpose of discussion that the statute did not exist, we believe that the evidence proffered in this case was sufficient to satisfy the requirements of *Frye-Reed* relating to general acceptance in the scientific community of genetic testing for establishing paternity.

■ *Frye* relates to the issue of whether the procedure under consideration is widely recognized or experimental. Evidence to establish reliability under *Frye* is resorted to only in those situations where reliability cannot be judicially noticed.[2] We note that the Court of Appeals in *Reed* was dealing with an acknowledged division in the scientific community concerning the validity of the voice print process. Fifteen scientists favored the process, five opposed it. Both *Frye* and *Reed,* unlike paternity proceedings, are criminal cases. Evidentiary rules need not be uniform in criminal

---

**2.** *See Reed, supra,* 283 Md. p. 380, 391 A.2d 364. The *Frye* "general acceptance" test does not always work. The "paraffin test" to detect gunshot residue was widely used from 1930 until 1967 when the first comprehensive evaluation of the test was published in the scientific literature. That study found the test to be unreliable. Cowan & Purdy, 12 J. Forensic Sci. 19 (1967).

and civil cases. *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (Pa.1977).

In the present case the trial court heard, by proffer, from two expert witnesses who testified to the reliability of genetic testing and no contrary evidence was offered. The trial court determined that the two witnesses proffered by the state were experts only to the extent that they were qualified to perform the tests. We point out, however, that in many instances the person who conducts the test also interprets the results. Firearms identification, fingerprint and drug analysis are illustrative techniques. The witnesses offered as experts by appellant were Margaret Brooks and Terry Houtz. Mrs. Brooks, a medical technologist with thirty-two years experience in the field, is the General Supervisor of the Red Cell Lab at the Baltimore RH Typing Laboratory. Sixty percent of the work performed by the Laboratory is related to paternity studies which began in 1945. Mrs. Brooks has no academic degree, but she has received training in paternity blood testing from the following: American Association of Histocompatibility Testing, National Institute of Health, American Association of Blood Banks, and the International Society of Forensic Hemogenetics.

The University of Maryland began a degree program in Medical Technology in 1970; Mrs. Brooks has delivered lectures on paternity testing to the students in this program since its inception. She has presented two papers on paternity blood testing to the International Society of Blood Transfusions and Hemotology entitled, "Blood Testing to Establish Paternity Using Red Cell and HLA Antigens, Idoenzymes and Serum Proteins" and "Cases Illustrating Need for Thoroughness in Paternity Testing." Additionally, she is co-author with Terry Houtz and Dr. Ben Dawson of two articles on paternity blood testing, in the *International Journal of Forensic Science,* titled "Utility of HLA and Six Electrocyte Antigen Systems in Excluding Paternity Among Five Hundred Disputed Cases." Mrs. Brooks is the sole author of two chapters on paternity testing in a book

entitled *Medical Transfusion Practices.* She has qualified as an expert in the field of paternity blood testing by courts in Maryland, Pennsylvania, Washington and West Virginia. As noted earlier, she appeared as a witness before committees of the Maryland Legislature prior to the adoption of the present law. The percentage figures required by Sec. 66G, according to her testimony, were developed from information developed by the Baltimore RH Typing Laboratory.

Mr. Houtz, in addition to the articles he has co-authored with Mrs. Brooks, is the Supervisor of the HLA Typing Laboratory and he has been a medical technologist for twenty years. Prior to his present employment he was a research scientist for ten years at the University of Maryland Department of Surgery specializing in HLA Typing and its use in organ transplants.

Both Mrs. Brooks and Houtz stated that the HLA system is generally regarded within the scientific community as being reliable for paternity testing purposes and, further, that the American Medical Association, The American Association of Blood Banking and the American Association of Histocompatibility all recommend HLA testing for paternity determination.

According to the *Frye* standard, if a new scientific technique's validity is in controversy in the relevant scientific community, or if it is generally regarded as an experimental technique, then expert testimony based upon its validity cannot be admitted into evidence. *Frye,* p. 381. The court herein had no evidence of controversy in the scientific community and no evidence that the process was generally regarded as experimental.

Furthermore, the evidence before the trial court was, unlike the testimony in *Reed,* uncontradicted. In the absence of any evidence that the testing procedure was unreliable, coupled with reliability demonstrated by the two experts and the scientific organizations recommending the process, the court's refusal to accept the evidence was error. We hold that the statute mandates the admissibility of the

test results. The trial court erred in ignoring the statute and in engaging in a determination of general acceptance of genetic testing under *Frye-Reed.*

JUDGMENT REVERSED. REMANDED FOR NEW TRIAL.

Costs to be Paid by Appellee.