535 A.2d 936

**Thomas Robert KAMMER**

v.

**Christine J. YOUNG.**

**No. 49 Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Jan. 13, 1988.

566

Clay M. Barnes (John E. Raine, III and Barnes and Raine, P.A., on the brief), Towson, for appellant.

Joseph B. Spillman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Kurt L. Schmoke, State's Atty. and Robert Moss, Asst. State's Atty., for Baltimore City, on the brief), Baltimore, for appellee.

Argued before BISHOP, ALPERT and KARWACKI, JJ.

BISHOP, Judge.

A Baltimore City jury found appellant, Thomas Robert Kammer, to be the father of the child of Christine J. Young, appellee. From the decree of the circuit court based on this verdict, Kammer appeals.

We are presented with three issues:

I. That the admission of the blood test evidence was: (a) not in compliance with MD.FAM.LAW CODE ANN. § 5–1029; and (b) a violation of appellant's due process rights under the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights;

II. That certain hearsay testimony excluded by the court should have been admitted; and

III. That the court erred in refusing to give certain jury instructions proposed by appellant.

## FACTS

Appellee gave birth to a child on May 24, 1982. She alleged that appellant was the only man with whom she had had sexual intercourse in the year immediately preceding the child's birth. Appellant responded that his sexual relations with appellee had ended more than 15 months before the birth.

The court admitted into evidence, over objection, the results of the blood tests of appellant, appellee and the child, obtained in accordance with MD.FAM.LAW CODE ANN. Section 5–1029. Additional facts will be given in the course of the discussion of the issues.

## I.

### *Admissibility of Blood Test Evidence*

### (a)

### *Admission of Opinion Evidence Concerning the Interpretation of the Blood Tests*

In his attack on the admissibility of the interpretation of the blood tests, appellant claims that:

(1) the expert witnesses appellee called at trial were not qualified to perform statistical analysis, to interpret the results or to express an opinion on the ultimate issue of the "statistical probability" of the appellant's paternity; and

(2) the number presented to the jury was predicated upon a scientifically invalid formula and was not a competent "statistical probability of paternity" thereby rendering the laboratory report inadmissible at trial.

Appellant also asks that we reconsider our decision in *Haines v. Shanholtz,* 57 Md.App. 92, 468 A.2d 1365, *cert. denied* 300 Md. 90, 475 A.2d 1201 (1984), in which we held that by virtue of legislative enactment, blood test results which meet certain threshold requirements are admissible. We decline to do so.

This controversy is governed by § 5–1029 of the MD. FAM.LAW CODE ANN. (1984) which provides in pertinent part:

5–1029. **Blood tests.**

(a) *In general.*—On the motion of a party to the proceeding or on its own motion, the court shall order the mother, child, and alleged father to submit to blood tests to determine whether the alleged father can be excluded as being the father of the child.

(b) *Approved laboratory required.*—The blood tests shall be made in a laboratory selected by the court from a list of laboratories provided by the Administration.

(c) *Form of results.*—The laboratory shall report the results of each blood test in writing and in the form the court requires.

(d) *Copies of results.* A copy of the results of each blood test shall be provided to the parties or their counsel in the manner that the court directs.

(e) *Results as evidence.*—(1) The results of each blood test shall be received in evidence if:

(i) definite exclusion is established; or

(ii) the testing is sufficiently extensive to exclude 97.3% of alleged fathers who are not biological fathers, and the statistical probability of the alleged father's paternity is at least 97.3%.

(2) A laboratory report is prima facie evidence of the results of a blood test.

(3) If a laboratory report is admitted in evidence, the laboratory technician who made the test is subject to cross-examination by any party to the proceeding.[1]

We begin our analysis of the applicability of this section to the appellant's claims by setting out the following facts which are undisputed by the parties:

---

1. The omitted subsections, (f) and (g), deal with failure to submit to the tests and payment of costs for the tests.

(1) Appellee's witnesses are employed by an approved blood testing laboratory and are qualified in the field of paternity testing, but are not trained statisticians. Appellant's witness is a trained statistician and although he is not employed by a blood testing laboratory he does consult, as part of his employment, with the paternity testing laboratory at Johns Hopkins Hospital.

(2) The blood tests were performed by an approved laboratory and the testing was done for blood group markers in seven different systems, six in the red cell laboratory and for HLA [2] in the white cell laboratory.

(3) The combination of the HLA and red cell tests is sufficiently extensive to exclude more than "97.3% of alleged fathers who are not biological fathers".

(4) The "paternity index" [3] in this case is 460 to 1, i.e. it is 460 times more likely that appellant could produce the 'single sperm carrying the necessary genetic information than a random man in the population.

(5) The prior probability [4] used by the laboratory in converting the paternity index to a percentage was .5, and that number is the standard used for such tests.

(6) Using a prior probability of .5, the percentage which results from application of Bayes' Theorem [5] to the paternity index of 460 to 1 is 99.78%.

---

**2.** HLA is the abbreviation for human leucocyte antigen.

**3.** A paternity index is a ratio which expresses the odds that the accused is the father of the child based on his chance of producing a sperm that carries all the necessary genetic information in conjunction with the mother's genetic information as compared to finding such a sperm in the random population.

**4.** Prior probability is expressed as a number, in the form of a percentage, which represents the accumulated non-genetic evidence that tends to indicate the accused man's paternity.

**5.** Bayes' Theorem is a mathematical technique accepted in the blood testing field for calculating conditional probabilities. *See* Ellman and Kaye, *Probabilities and Proof: Can HLA and Blood Group Testing*

■ At this point, however, the dispute is centered on § 5–1029(e)(1)(ii), which requires that "the statistical probability of the alleged father's paternity [be] at least 97.3%". Appellant argues that this phrase should be construed strictly and that the method used to arrive at the percentage should be scrutinized according to the technical definition given by statisticians to the term "statistical probability". This argument forms the basis for his claims that: (1) appellee's witnesses, who lack training in statistics, are incompetent to interpret and to present the results of the blood test as a "statistical probability" of paternity; and (2) the methodology used to arrive at the statistical probability of paternity is based on a scientifically invalid formula and therefore it is not a true "statistical probability" of paternity.

In *Haines v. Shanholtz, supra*, we held that by virtue of the adoption of Chapter 784, Acts of 1982, the legislature expressly recognized the reliability of genetic testing.[6] 59 Md.App. at 97, 468 A.2d 1365. We found the legislative intent "clear" and stated:

> [G]enetic testing is valid, subject to cross-examination of those responsible for performing and evaluating the tests. The trial judge has the discretion of admitting testimony that may have a bearing on the *weight* of the testimony offered as to the genetic testing, but not, by reason of the statute, as to the admissibility *vel non* of genetic testing to establish paternity.

*Id.* at 98, 468 A.2d 1365 (emphasis in original). The question that arises in the case *sub judice* is therefore: whether

---

*Prove Paternity?* 54 N.Y.U.L.Rev. 1131, 1149 (1979). *See infra* p. 575 and Appendix, p. 587.

**6.** Chapter 784 amended Art. 16 Chancery § 66G, the predecessor of § 5–1029, and permitted the use of blood test results which are sufficiently extensive to exclude 97.3% of putative fathers who are not biological fathers where the statistical probability of paternity is at least 97.3%. The statute was amended again in 1984 to *require* the introduction of blood test evidence which meets the statutory standards instead of merely allowing it.

appellant's two-pronged attack goes to the admissibility of genetic testing or to the weight of the testimony offered, the former being impermissible as a result of the statute.

We conclude that the first prong of appellant's attack, regarding the qualifications of appellee's witnesses, goes to the weight of the testimony offered, but we find it unpersuasive. Our review of the legislative history of § 5–1029(e)(1)(ii) does not support appellant's claim that the legislature intended that the results of the blood test be expressed in terms of a "true" "statistical probability". Neither the Judicial Proceedings Committee of the Maryland State Senate nor the Judiciary Committee of the Maryland House of Delegates received testimony from a statistician, and the legislative history is devoid of any indication that there was testimony regarding the precise scientific formula required in order to render a "true" statistical probability. We hold that the legislature used the term "statistical probability" within the context and according to the meaning contained in the testimony of the experts from whom it heard: those in the blood testing community, including appellee's witness Margaret Brooks.[7]

Mrs. Brooks testified at trial that the terms plausibility and probability are interchangeable in the blood testing community. We must assume the legislature was aware of this and we therefore reject the "scientifically literal" interpretation of § 5–1029(e)(1)(ii) urged by appellant. To the blood testing community, the terms plausibility and probability carry with them a distinction without a difference.[8] To express the paternity index ratio, which in this case is 460 to 1, as percentage requires the use of a statistical formula.[9] The legislature called the resulting percentage a

---

7. Mrs. Brooks testified before the Senate committee only.

8. Even appellant's expert witness, Dr. Gary Chase, admitted that the paternity testing community does not use the same terms within the same context as the statistician's community, of which he is a member.

9. *See* note 5, *supra.*

"statistical probability".[10] Based on the foregoing, we conclude that appellee's expert witnesses are qualified, within the relevant community, to conduct the calculations necessary to express the 460 to 1 paternity index as a percentage as is required by the statute. We note that appellant's witness, Dr. Chase, acknowledged at trial that the methods and terms used by the blood testing laboratory are universal in the field of paternity testing.

Appellant's second challenge, regarding the admissibility of the laboratory report, is permissible only to the extent that it goes to the weight of the testimony offered. As we pointed out in *Haines*, once appellee meets the requirements of § 5–1029(e)(1)(ii), the statute "mandates the admissibility of the test results". 57 Md.App. at 100–01, 468 A.2d 1365. Appellant attempts to circumvent this holding by attacking the genetic testing procedure used and by arguing that the intent of the legislature was hardly to sanction an inaccurate or unreliable scientific methodology which results in an incorrect determination of paternity.

We acknowledged in *Haines* that the Legislature stopped short of adopting "any specific tests to establish the percentages necessary to include or exclude putative fathers". 57 Md.App. at 96, 468 A.2d 1365. We surmised that the reason for this was that the "General Assembly recognized that new technology may become available and, by not addressing any specific combination of tests, laboratories will be allowed to utilize the most effective tests without further legislative change". *Id.* The fact that the application of Bayes' Theorem, with a prior probability of .5, to the paternity index does not yield a "true" statistical probability of paternity does not invalidate the procedure or the result. The procedure used in this case is universally accepted by the relevant community of paternity blood testers and is the same procedure that was being used in 1984 when the

---

**10.** This choice of terms makes sense, because that is how it is expressed in the community that conducts the tests, and because the percentage is reached only after application of a statistical formula.

Legislature amended the blood testing statute to require the introduction of blood test evidence. Indeed, the laboratory that performed these tests and computed these results is the same one that supplied the experts who testified in regard to the 1982 statutory amendment and who testified in *Haines.*

By contrast, the interpretation urged upon us by appellant would effectively nullify the statute. If we were to agree with his expert, Dr. Chase, no blood testing laboratory could produce results sufficient to satisfy the "statistical probability" requirement of the statute since they would not have access to the relevant non-genetic evidence needed to assign an "accurate" prior probability of paternity to Bayes' Theorem. This interpretation runs counter to the legislative goal which, as expressed in *Haines,* was "to protect illegitimate children through court ordered support based upon *sophisticated and reliable* genetic testing." 57 Md.App. at 96, 468 A.2d 1365 (emphasis added).

#### (b)
#### *Admission of the Blood Test as a Violation of Due Process*

Appellant contends that even if appellee properly complied with the blood test statute, the admission of any opinion evidence concerning the father's alleged "statistical probability" of paternity violates the due process provisions of the United States and Maryland Constitutions.[11] He also claims that apart from the due process violation, the introduction of statistical and mathematical evidence on the ultimate issue before the jury effectively deprived him of a fair and impartial trial by jury as guaranteed by Article 23 of the Maryland Declaration of Rights.

Appellant's due process challenge is actually a two-pronged attack. He asks whether: (1) due process of law permits a paternity index to be converted to a statistical

---

11. Amendment XIV of the United States Constitution and Article 24 of the Maryland Declaration of Rights.

probability of paternity through the use of Bayes' Theorem with an assigned prior probability; and (2) the limited reference population used in this case [12] can be used to compute the "paternity index" used in the equation.

Once appellant's paternity index has been calculated, it must then be converted to a statistical probability in order to determine whether it meets the 97.3% benchmark for admissibility set forth in § 5–1029(e)(1)(ii). The mathematical equation used in making this transformation is Bayes' Theorem, a basic formula of probability theory. It is expressed as follows:

$$P(F/M) = \frac{1}{(1-f) + (f/P(F))}$$

where

$$f = \frac{P(M/not-F)}{P(M/F)}$$

In this formula, P(F) represents the prior probability and it is factored into the equation in order to account for the non-genetic evidence of the accused man's paternity.[13]

Ideally, the prior probability should reflect an assessment of all the relevant non-genetic evidence in each individual case and should take into consideration such factors as the accused man's opportunity for access to the child's mother during the period of conception, the evidence linking the child's mother to other men during that time period and the credibility of the witnesses. In the case *sub judice,* however, an assumed prior probability of fifty percent (.5) was used in converting appellant's paternity index to a statistical probability. He contends that this was a violation of his due process rights. We disagree.

 Appellant claims that the methodology employed by all of appellee's experts assumes a fact not in evidence (the prior probability) and it is therefore scientifically inaccurate

---

**12.** Appellant's blood markers were compared against a gene frequency chart which shows how often his specific gene pattern arose in the United States in tests of 12,000 persons of his same race.

**13.** The remaining variables are defined in the attached Appendix.

and invalid. We disagree. The evidence presented at trial makes plain that within the relevant community of blood testers, the paternity probability calculations in the present case were based upon scientific methods, accepted world-wide, which incorporate both Bayes' Theorem *and* the .5 prior probability.[14] All of the experts who testified at trial agreed that the paternity index, representing only the pure-ly genetic evidence (the HLA and the red cell tests), was 460 to 1. Furthermore, using Bayes' Theorem and a prior probability of .5, all of the experts (including appellant's expert Dr. Chase) calculated the same probability percent-age of 99.78%.[15] The mathematical basis for the .5 figure was explained by Dr. Chase in the following manner:

> If you know nothing about a set of possibilities then the principle of insufficient reason says you are entitled to assign equal prior probability to those alternatives. [T]hat's what's used to get this .5. This .5 comes from a principle that says we don't know whether he was the father or somebody else was the father. So we are going to split the probability fifty-fifty between the two possi-bilities. We are going to load him with 50 percent of it and give the other percent to all the other men.

When calculating a statistical probability of paternity, the blood testing laboratory does not have before it any of the individualized non-genetic evidence, and it therefore uses a standard figure (.5) whenever it makes its calculations. This fact neither renders the methodology "scientifically invalid" nor does it deny appellant an opportunity to present the non-genetic evidence. If the laboratory's calculations meet the prerequisites for admissibility set forth in

---

**14.** Because the use of the .5 as a basis for prior probability meets the requirement of general acceptance in the relevant community, it satisfies the test for admission of scientific evidence set out in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) and adopted by the Court of Appeals in *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978).

**15.** The calculations are set out in the Appendix, *infra.*

§ 5–1029(e)(1)(ii) the blood test evidence is admitted, but it is neither conclusive nor does it create a presumption, it is merely one piece of evidence that is put before the jury. Appellant was free to, and in fact did, put on non-genetic evidence which not only disputed generally his paternity but, in effect, was an attack upon the use of the .5 prior probability figure. This allowed him an opportunity to counterbalance appellee's introduction of the blood test results and the prior probability on which they were based and served to protect his due process rights.

We decline to respond to appellant's second contention, regarding the sufficiency of the reference population used in determining the paternity index, on the basis of Maryland Rule 1031 c 5 and this Court's holding in *Van Meter v. State*, 30 Md.App. 406, 352 A.2d 850 (1976). Nowhere in the record or in the briefs does appellant offer any argument in support of his claim that the reference population used was inadequate. In his brief, appellant merely states:

> The record also raises a serious question about whether the "reference population" used by the Baltimore RH Laboratory, consisting in total of a mere 12,000 persons, is legally sufficient upon which to predicate the appellant's paternity index" of 460:1. Appellant respectfully submits that there is no legally sufficient evidence to support the assumption made by the Baltimore RH Laboratory that this data base is adequate to use with Bayes' Theorem to extrapolate the statistical "plausibilities" made in this case, or that it is a proper "reference population" at all.

Yet, he offers *no proof* to support his conclusion. From this bald assertion, appellant leaps to the conclusion that his due process rights have been violated because of the size of the reference population used. Appellant, by failing to include in his brief any argument to support his claim that the reference population was insufficient, provides us with

nothing to consider as a basis for his contention.[16]

■ Appellant does provide some argument on his right to a fair and impartial jury trial claim; however, we are not persuaded. He argues that the "statistical approach to the case distracted the jurors from weighing the evidence and determining the ultimate credibility of the plaintiff and defendant ..." and that the jury "unquestionably was overwhelmed" by the testimony that the "plausibility" of the appellant's paternity was "99.78%", and therefore he was denied a right to a fair and impartial trial. The "statistical approach" to this case is no different from any other paternity case, and it is precisely what is required by the statute. The fact that the percentage obtained, 99.78%, may be perceived as "overwhelming" because of the extent to which it reaches 100% conclusiveness does not in any way prevent appellant from receiving a fair trial. The "statistical probability of paternity" required by the statute comprises only one part of the evidence that is put before the jury concerning the alleged father's probable paternity.[17] It is not the only evidence and it does not create an irrebuttable presumption of paternity. Appellant was allowed to put on evidence in support of his claim that he is not the child's father. All of the evidence went to the jury and there is no evidentiary support for his claim that the jurors improperly relied on the statistical probability as being dispositive of the issue.

## II.

### Hearsay

Appellant next argues that the court erred in excluding from evidence a hearsay statement in which another man,

---

**16.** At oral argument, appellant's attorney said he would not "attack" the reference population used in this case and that he was willing to "stipulate that it is 'ok'."

**17.** The court instructed the jury, in part, "You should give expert testimony the weight and value you believe it should have. You are not required to accept any expert's opinion. You should consider an expert's opinion together with all the other evidence."

Larry Klouser, admitted sexual access to appellee during the crucial period of conception and indicated that he could have been the father. Klouser had died sometime before trial. Although appellee admitted a close relationship with Klouser, she denied any sexual relations. Appellant's counsel proffered that Theresa Driscoll, who is appellant's sister and who was an acquaintance of both appellee and Klouser,

> will testify that Larry Klouser told her ... that he had had a sexual relationship with the plaintiff in August of 1981 and stated ... that he could have easily been the father or implied to her that he could have been the father and wanted to stay out of this controversy.

Kammer cited to the trial court and cites on appeal *Aetna Casualty & Surety Co. v. Kuhl*, 296 Md. 446, 463 A.2d 822 (1983) and *Houck v. DeBonis*, 38 Md.App. 85, 379 A.2d 765, *cert. denied* 282 Md. 734, *U.S. cert. denied* 434 U.S. 967, 98 S.Ct. 511, 54 L.Ed.2d 454 (1977), to support his contention that the Klouser statement was admissible under the declaration against interest hearsay exception. The trial court refused to read the two cases and stated:

> It is not admissible. It is pure hearsay. Absolute, clear hearsay. It is not admissible. It may affect the primary interest. That's something else, but as to the legitimacy of a child in a bastardy case ... [i]t is entirely different. It is not admissible.

*Aetna* and *Houck* support appellant's position that Klouser's statement would be a declaration against interest. The basic reasoning in those cases may, in succinct form, be summarized in the following statement from *McCormick on Evidence* at 819–820 (Cleary, 3rd Ed. 1984) concerning the two main requirements for satisfying the exception to the hearsay rule:

> [F]irst, the declaration must state facts which are against the pecuniary or proprietary interest of the declarant, or the making of the declaration itself must create evidence which could endanger his pocketbook if the statement were not true; second, the declarant must be unavailable at the time of trial. The first requirement has been

believed to furnish the safeguard of special trustworthiness justifying most of the exceptions to the hearsay rule.... The declarant ... must ... have had the opportunity to observe the facts, as witnesses must have. (Footnotes omitted.)

*McCormick* points out that if the first requirement is met, it furnishes "the safeguard of special trustworthiness [which justifies] most of the exception to the hearsay rule." *Id.* at 819.

In *State v. Standifur*, 310 Md. 3, 526 A.2d 955 (1987), the Court was presented with the question of whether a declaration against the penal interest of an unavailable witness, offered by the State against the accused in a criminal trial, is sufficiently reliable to qualify under the common law exception to the hearsay rule and to satisfy the Confrontation Clauses of the Constitution of the United States and the Declaration of Rights of Maryland. Judge McAuliffe, writing for the Court, began his treatment of this question by noting that a declaration against penal interest is recognized in Maryland as an exception to the hearsay rule. 310 Md. at 9, 526 A.2d 955 (citations omitted). He also pointed out that it is similarly excepted by the Federal Rules of Evidence and by a majority of the states, and quoted from Federal Rule of Evidence 804(b)(3) which provides:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

(3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

From this, Judge McAuliffe went on to consider the ramifications of inculpatory statement that implicate third persons. These "inculpatory statements of an accomplice no longer involved in the criminal enterprise are inherently suspect and the particular circumstances surrounding the making of such statements must be carefully examined." 310 Md. at 15, 526 A.2d 955 (footnote omitted). As a result of the Court's careful analysis, the statement under analysis in *Standifur* was held to be not admissible.

■ In the case *sub judice*, we have an allegation that an unavailable third party (Klouser), made an inculpatory statement (that he could be the child's father) which was against his pecuniary interest. In determining whether this alleged hearsay statement should be admitted, we find Judge McAuliffe's discussion of whether a third party's statement qualifies as a declaration against penal interest instructive:

> In summary, a trial judge considering the admissibility of a hearsay statement offered as a declaration against penal interest must carefully consider the content of the statement in the light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant, and determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made. The trial judge should then consider whether there are present any other facts or circumstances, including those indicating a motive to falsify on the part of the declarant, that so cut against the presumption of reliability normally attending a declaration against interest that the statements should not be admitted. A statement against interest that survives this analysis, and those related statements so closely connected with it as to be equally trustworthy, are admissible as declarations against interest.

310 Md. at 17, 526 A.2d 955. Judge McAuliffe's analysis closely tracks that contained in *McCormick, supra,* § 279 at 824–27 concerning both civil and criminal cases, and in our opinion it is equally applicable to cases, such as the one *sub judice,* where a statement is offered as a declaration against pecuniary interest.[18]

Applying the *Standifur* test to the facts of the case *sub judice,* we hold that the exclusion of the Klouser declaration, when considered "in the light of all known and relevant circumstances surrounding the making" of it and "all relevant information concerning" Klouser, was not an abuse of discretion. The proffered declaration of Klouser was made after appellant was named as the putative father, a fact which attenuates the conclusion that the statement was indeed against the declarant's interest. Once appellant had been named in the paternity suit, it was unlikely that Klouser would be accused of being the father and subjected to a paternity suit whose outcome could affect his pecuniary interest. Thus, at that point in time, he had little to lose.

Absent from the proffer were the relevant circumstances and information surrounding Klouser's making of the statement which are necessary to establish the required indicia of truthfulness. *See generally Brennan v. State,* 151 Md. 265, 134 A. 148 (1928) (statement by third person that he was the father of the child admitted as exception to general rule excluding such statements in paternity cases where testimony was to come from third party's sister, and where suicide note existed which stated that his suicide was brought about by the birth of the illegitimate child.) On the contrary, there was no evidence that would support the conclusion that Klouser indeed had sexual intercourse with appellee during the period of conception. Such a relationship is denied by her and, in fact, she claims that Klouser was not interested in a sexual relationship with her because he was a homosexual. Thus, the only testimony in this

---

**18.** Federal Rule 804(b)(3) specifically includes statements against pecuniary interest.

regard is the proffer of appellant's sister. Although the fact that the witness was appellant's sister would affect credibility rather than admissibility, it is a fact that must be considered in applying the *Standifur* test. We hold that the evidence was insufficient to prove that the trial judge did abuse his discretion when he excluded the evidence.

### III.

*Jury Instructions*

(a)

Kammer argues that the trial court's failure to explain the term *"prima facie"* to the jury constitutes prejudicial error. We disagree.

After the trial court instructed the jury, the following colloquy took place:

MR. BARNES (Appellant's attorney): The exceptions are two-fold. I wanted you to explain one phrase that you used in the blood test. You said prima facie.

THE COURT: What?

MR. BARNES: You said prima facie.

THE COURT: That is what I said. That's what it says in the statute.

MR. BARNES: This is a legal phrase. I think you should tell them what it means. What it means in the lawyer's vernacular—

THE COURT: You tell them in closing argument. All right with me.

MR. BARNES: Will you instruct them prima facie— what that means?

THE COURT: Sure. I won't quarrel with that. You can explain it.

MR. BARNES: But will you instruct them the definition of prima facie?

THE COURT: I might.

The trial court, however, did not instruct the jury on the meaning of *prima facie*. The trial court did instruct the

jury that § 5–1029(e)(2) stated that "a laboratory report is *prima facie* evidence of the result of a blood test".

■ Sections (b) and (e) of Rule 2–520, Instructions to the Jury, govern the disposition of this issue:

**(b) Written Requests.**—The parties may file written requests for instructions at or before the close of the evidence and shall do so at any time fixed by the court.

\* \* \* \* \* \*

**(e) Objections.**—No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury.

The trial court properly asked the parties for proposed instructions. Kammer must have been aware that the trial court would give an instruction based on § 5–1029(e), and would include the term *"prima facie"*, because of the centrality of that section to the issues. Kammer should have prepared either a written instruction, or orally proffered to the court a proposed definition. He did neither, and his "exception"[19] failed to provide the trial court with a proposed definition.

Under Rule 2–520(b), where a trial court fails or refuses to give an instruction on a specific issue, it is the responsibility of the party proposing the instruction to make, a proper request, which includes submitting to the trial court the contents of the proposed instruction. Without this, the trial court need not act. In the case *sub judice,* the trial court was not presented with a proposed definition of the term *"prima facie"*. There was not a proper request for the disputed instruction and we will therefore not address the issue. Md.Rule 1085.

---

**19.** We note that under Rule 2–520(e) formal "exceptions" are no longer required.

In addition, under Rule 2–520(e) a party may not assign as error on appeal the failure to give an instruction unless there is a proper objection, which necessarily includes the stating of the grounds. Here, sections (b) and (e) of Rule 2–520 must be read together. Kammer's purported objection failed to state adequately the grounds for his objection, not because the trial court was unaware of the subject of the objection, but because Kammer failed to provide the court with a proposed instruction. Kammer, in his brief, very cogently provides this Court with several definitions of the term *"prima facie"*, but it was fatal not to have done so at trial.

**(b)**

Kammer also argues that the trial court's failure to give the following instruction, based on *Staley v. Staley,* 25 Md.App. 99, 335 A.2d 114, *cert. denied,* 275 Md. 755 (1975), constituted prejudicial error:

> If you find the plaintiff in this case associated with another man, under suspicious circumstances, at or about the time of her pregnancy, you may consider this fact on the issue of paternity in this case.

In *Staley,* we held:

> [S]ince there was evidence of a relationship between the mother and her alleged paramour during the period of conception, the chancellor did not err in admitting evidence of possible misconduct occurring between them at times subsequent to the period of conception.

25 Md.App. at 108, 335 A.2d 114. Central to our analysis in *Staley* was the existence of competent evidence that both the husband of the plaintiff, and the alleged putative father, the paramour, had visited the plaintiff under "suspicious circumstances" at the time of conception. Explicit in the *Staley* analysis was the recognition that the proffered evidence, to be competent on the issue of the mother's sexual relations with men other than the alleged father, must relate to the time of conception. *Id.* at 106–07, 335 A.2d 114.

Appellant asserts that the *Staley* instruction was required because of the testimony of Lois Kammer, Theresa Driscoll and the appellee. Lois Kammer is the wife of Kammer's brother and the sister of Klouser, the latter of whom, appellant alleges, had a relationship with appellee under "suspicious circumstances". Theresa Driscoll is Kammer's sister. Lois Kammer testified that she knew her brother, Larry Klouser, was bisexual and that he and the appellee were close friends; also, that appellee spent the night with her brother sometime between 1979 and 1981. Theresa Driscoll testified that several times during the summer of 1981 Larry Klouser; appellee and herself went to the beach. All three were good friends. Appellee denied that she and Larry Klouser ever had sexual relationship but stated that Mr. Klouser was a confidant to whom she sometimes told her inner secrets. She also testified that Larry Klouser was a homosexual and that he was more like a "girlfriend" and admitted that she did visit his home alone on many occasions.

■ From this testimony, the trial court did not err when it refused to give a *Staley* based instruction. Under Maryland law, "a litigant is entitled to have his theory of the case presented to the jury, but only if that theory of the case is a correct exposition of the law and there is testimony in the case which supports it." *Sergeant Co. v. Pickett,* 285 Md. 186, 194, 401 A.2d 651 (1979) (quoting *Levine v. Rendler,* 272 Md. 1, 13, 320 A.2d 258 (1974)). The evidence which speaks to "suspicious circumstances" at the time of conception in August of 1981, was: (1) the testimony of appellee that during 1981, she saw Klouser approximately once a week and was alone with him in Klouser's basement living quarters "on many occasions"; and (2) the testimony of Lois Kammer that appellee and Klouser spent the night together in Klouser's basement, but she did not know "exactly when". Ms. Driscoll could state only that the frequent contact between appellee and Klouser occurred sometime "from 1979 to 1981". Appellee's denial of any sexual contact combined with Ms. Driscoll's inability to

sufficiently narrow the period in which the alleged questionable conduct occurred, clearly distinguishes this testimony from that in *Staley.* We hold that the trial judge correctly concluded that this testimony, although relevant, did not meet the standard required to justify the requested instruction. *Twining v. State,* 234 Md. 97, 102–03, 198 A.2d 291 (1964) and cases cited therein.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.

## APPENDIX

Bayes Theorem is expressed as follows:

$$P(F/M) = \frac{1}{(1-f) + (f/P(F))}$$

Where

$$f = \frac{P(M/not-F)}{P(M/F)}$$

And

| | |
|---|---|
| P(F) | represents the prior probability |
| P(F/M) | represents the statistical probability of paternity |
| f | represents the quotient yielded when the random man's chance of fathering the child is divided by the accused's chance of fathering the child |
| P(M/not–F) | represents the random man's chance of fathering the child based upon the value calculated for each of the seven blood systems tested using a hypothetical blood type and the mother's blood type |
| P(M/F) | represents the accused's chance of fathering the child based upon the value calculated for each of the seven blood systems tested using his blood type and the mother's blood type |

The values used in this case were:

P(M/not–F) = .001821

P(m/F) = .0838570

f = .00217155

The calculations made were:

$$P(f/M) = \frac{1}{(1-.00217155) + (.00217155/.5)}$$

$$= \frac{1}{.9978285} = .004343$$

$$= \frac{1}{1.0021715}$$

$$= .9978332 = \boxed{99.78\%}$$

$$P(F/M) = 99.78\%$$