# BOARD OF EDUCATION OF MONTGOMERY COUNTY *v.* HUGHES ET AL.

[No. 154, September Term, 1973.]

*Decided March 29, 1974.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*Roger W. Titus* and *Robert S. Bourbon*, with whom was *John T. Horton* on the brief, for appellant.

*Carl Harrison Lehmann* for appellees.

SMITH, J., delivered the opinion of the Court.

In what will be an unsuccessful attempt to obtain a new trial on the issue of damages in a condemnation proceeding, appellant, the Board of Education of Montgomery County (the Board), here objects to testimony of the owner as to what he paid for the whole tract and, also, to testimony of one of the owner's appraisers relative to what he considered to be an integral part of fair market value, namely the value of the income to be derived from the land pending its full development. The amount of damages is the only point at issue, since public necessity for the acquisition was admitted by the owner and stipulated to at the trial.

Herbert H. Hughes, one of the appellees, owns the land in question. The other appellees are the trustees of a deed of trust which is a lien on the subject property. Hughes, therefore, is the one vitally interested. His 10.4 acre tract of land is located between Germantown and Gaithersburg in the Middlebrook area of Montgomery County; between Maryland Route 355 and Route I-70S. In fact, Route 355 is the eastern boundary of the whole parcel. The Board sought to condemn the back 3.4789 acres for the site of a future school to be known as Urbana Elementary School. The property owner retained the portion of the land fronting on

the highway. In essence, it may be said the Board's chief complaint is its state of shock at a jury verdict of $83,500, or about $24,000 per acre, which seems a bit high to it for unimproved back land in Montgomery County even in this present day and age.

Since this is an eminent domain case in which the points raised on appeal have to do with the admission of evidence, we shall evaluate the objections in the light of *Hance v. State Roads Comm.*, 221 Md. 164, 156 A. 2d 644 (1959), where Judge Prescott said for the Court:

> "Courts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice. This is especially true in condemnation proceedings. Such cases usually consume much time in trial, and are expensive in nature. As a rule, they are determined by a myriad of different items of evidence. The exclusion or admission of small items of evidence of doubtful materiality are not likely to be of great importance in the outcome of the case, and most courts refuse to set aside a verdict in cases of this kind, for error in the rulings on questions of evidence, unless, as indicated above, substantial prejudice be shown. 5 *Nichols*, [*Eminent Domain*], Sec. 18.1 [2]." *Id.* at 176.

To like effect *see Md. Community Dev., Inc. v. S. R. C.*, 261 Md. 205, 208, 274 A. 2d 641 (1971); *Belworth, Inc. v. City of Baltimore*, 256 Md. 369, 372, 260 A. 2d 284 (1970); *First Nat'l Realty v. S. R. C.*, 255 Md. 605, 610, 258 A. 2d 419 (1969); and *State Roads Comm. v. Kuenne*, 240 Md. 232, 235, 213 A. 2d 567 (1965).

i

Under the provisions of Maryland Code (1957, 1973 Repl. Vol.) Art. 21, § 12-104, the value of the land was determined as of the date of trial, June 5, 1973, since there had been no prior taking. The Board complains because the owner was permitted to testify, over objection, that he paid $247,500 for

the whole tract when he bought it in December, 1965. It urges that this testimony was not admissible since "the sale occurred seven and one-half years prior to the time of taking and did not cover substantially the same property which is the subject of the condemnation proceedings."

In *Baltimore City v. Schreiber*, 243 Md. 546, 551, 221 A. 2d 663 (1966), we permitted a property owner to testify as to the purchase price. Judge Marbury there reviewed the authorities for the Court. The Board regards as significant his statement for the Court:

> "The general rule in this country and in this state is that 'evidence of the price paid for condemned real property on a sale prior to eminent domain proceedings is admissible in the proceedings at least where the sale is voluntary, is *not too remote in point of time,* or is not otherwise shown to have no probative value.' (Emphasis added.) Anno. 55 A.L.R.2d 793-812, and cases therein cited at pages 794-797." *Id.* at 551.

It also sees significance in the further statement in that case:

> "[T]he better rule seems to be that if, in the sound discretion of the trial judge, the time is not so remote as to destroy its probative value in regard to the issue of present fair market value, then he should admit the testimony and leave the weight of the evidence for the consideration of the jury, along with such distinguishing factors as may be brought to the attention of the jurors on cross-examination or otherwise." *Id.* at 552.

In *Schreiber*, the Court held that evidence of the purchase price 10 years prior to condemnation as to one parcel and nine years before that date as to another was not "so remote in point of time as to have no probative force in regard to present fair market value, and thus [it found] no abuse of discretion on the part of the trial judge in failing to sustain objections to this testimony." The Board suggests, however,

that in this case "a new condition is presented which has not heretofore been considered by this Court." It says that here "evidence was introduced as to the seven-and-one-half-year old purchase price of the 10.04-acre tract of which the subject property was only a small part. Furthermore, the entire tract contained far more desirable land at the time of the earlier sale fronting on a state road and was improved by and benefited from the operation of a trailer park and restaurant business."

The ancient Preacher of more than 2000 years ago, said by some to have been King Solomon,[1] one of the wisest and noblest of men, and said by others to have written as much as 700 years after Solomon,[2] said, "[T]here is nothing new under the sun." [3] Just a bit less than 200 years ago the similar observation was made, "There is nothing new except what has been forgotten." [4] Thus, it is not surprising that the Board's proposition here is not new and that our earlier consideration of it has been overlooked or forgotten.

In *Williams v. New York, P. & N. R.R.*, 153 Md. 102, 137 A. 506 (1927), cited in *Schreiber*, a railroad company sought to condemn land near Salisbury in Wicomico County. The trial court excluded testimony of one of the defendants "in regard to a recent sale to him of a portion of the land sought to be condemned, and the price agreed to be paid by him, and his payments on account of the purchase money." Judge Adkins said for the Court:

> "There was reversible error in these rulings. It was said in *Baltimore v. Smith*, 80 Md. 458: 'We think,

---

1. H. Halley, Bible Handbook 274 (24th ed. 1965).

2. H. Gehman, The New Westminster Dictionary of the Bible 238, 892 (1970), and F. Eiselen *et al.*, The Abingdon Bible Commentary 614 (1929).

3. Ecclesiastes 1:9 (RSV). The complete quotation is:

"What has been is what will be, and what has been done is what will be done; and there is nothing new under the sun.
Is there a thing of which it is said, 'See, this is new'?
It has been already, in the ages before us.
There is no remembrance of former things, nor will there be any remembrance of later things yet to happen among those who come after."

4. Attributed to Mlle. Bertin, Marie Antoinette's milliner, about 1785.

therefore, that the prices realized at sales of the land in question and of similar land in its vicinity, made within a reasonable period of time theretofore, being voluntary and not forced sales, are admissible in evidence, either on direct or cross-examination of witnesses conversant with the facts.' There is nothing in the record to indicate that this sale was not made in good faith; and if it was, there could not well be more relevant testimony as to the value of the property." *Id.* at 110.

The objection of the Board here overlooks the measure of damages in a partial taking, a point that did not escape the trial judge (McAuliffe, J.). He said:

"The valuation schedule formula requires a consideration of the value of the entire tract before the taking and after the taking. Therefore, the value of the entire tract is relevant to the proceedings, is it not?"

Chief Judge Brune said almost precisely the same thing for the Court in *Baltimore v. State Roads Comm.*, 232 Md. 145, 192 A. 2d 271 (1963):

"[I]n condemnation cases, the value of what is taken is ordinarily to be determined in a case of partial taking by the difference between the fair market value of the entire tract before the taking and the fair market value of what is left after the taking. See *Veirs v. State Roads Comm.*, 217 Md. 545, at 554-55, 143 A. 2d 613, and cases there cited . . . ." (Citing cases.) *Id.* at 152.

The elapsed time between the date of purchase in this case and the date as of which fair market value was to be determined was less than that approved by us in *Schreiber*. Evidence as to the purchase price of the entire tract was relevant, since the jury was obliged to determine the difference between the fair market value of the entire tract before the taking and the fair market value of the remaining

tract after the taking. Accordingly, there was no abuse of discretion on the part of the trial judge in admitting into evidence the testimony of the owner as to the sum he paid for the purchase of the whole tract at a time seven and one-half years prior to the date of trial.

ii

The second point of controversy concerns testimony of an expert for the landowner.

At the time of trial the whole tract was zoned R-R. Under the Montgomery County zoning ordinance the R-R zone generally called for single-family, detached dwellings on lots having a minimum size of 20,000 square feet. The area involved is covered by the Germantown Master Plan. It recommends future R-30 zoning for part of the tract and R-20 zoning for the remainder. Both zones permit multiple family residential construction. The R-30 zone allows a maximum of one dwelling unit per 3,000 square feet of land. The R-20 zone allows a denser construction of one dwelling unit per 2,000 square feet of land.

Appraisers for the Board and the owner were in agreement that there was a reasonable probability of a change in the zoning classification within a reasonable time. *See Hutchison v. Balto. Gas & Elec.*, 241 Md. 329, 332-33, 216 A. 2d 573 (1966). The testimony of all appraisers was that the highest and best use for the whole tract was multi-family residential development in line with those envisioned changes.

The owner's expert testified that in his opinion the value of the whole tract before the taking was $276,100 and that the value of the portion remaining after the taking was $180,500, a difference of $95,600 or about $27,500 per acre for the land taken. Further inquiry developed the hypotheses upon which he rested his opinion. He testified relative to sales with unit values of $33,850, $26,500, $24,713, and $24,047 per acre; that his "adjusted" unit values for the same sales were $26,400, $21,700, $23,452, and $21,414; and that in making adjustments he considered time, zoning status, and location. Without objection, he testified that the average of

his adjusted values was $23,250 per acre. From this it developed that he had used a "unit rate" for subject land of $22,500 per acre and that he had added to this the sum of $5,000 per acre to reach his appraisal of $27,500 per acre as the present fair market value. This $5,000 was based upon income derivable from the use then being made of the land as a trailer park, etc. He said a prospective purchaser normally would retain title to any given tract of land until it was developed by him to its highest and best use and that the expense of taxes, mortgage interest, possible mortgage repayment, and possible insurance in the interim would all be considered a burden. He claimed that a purchaser would take into consideration in his valuation of the whole that income which might be produced in the interim which he could apply to those expenses.

Two bases for the objection are advanced. The first is that the income data relied upon was "from a two-year-old tax return." This objection went to the weight of the evidence rather than to its admissibility. The Board was in a position to follow up on this on cross-examination and it did. Of course, the age of that data was available to counsel for comment in their argument to the jury.

The second basis for objection seems to be that the approach "seeks to allow the property owner to have his cake (value for the highest and best use) and eat it too (add an incremental value for income derived from present use)." The Board further states:

"As was readily admitted by [the appraiser], the improvements on the eastern portion of the tract would have no value for the highest and best use of the property. Only by his ingenious 'back-door' method was he able to testify concerning value attributable to income from improvements which would have to be destroyed under the highest and best use of the property."

It contends that this is but a piling of value onto value, most recently considered and rejected by us in *Mont. Co. v. Old Farm Swim Club*, 270 Md. 708, 313 A. 2d 458 (1974), and

previously considered in *Smith v. State Roads Comm'n*, 257 Md. 153, 161, 262 A. 2d 533 (1970). In *Smith,* the trial court was held to have properly excluded testimony regarding the value of sand and gravel deposits separate and apart from the value of the land. We do not see those cases as applicable to this situation.

In *Old Farm Swim Club* an expert had been permitted to testify as to the value of certain shade trees. He described a formula used by the International Shade Tree Conference as a basis for valuation. Through the application of that formula he then valued 28 trees at more than $11,000. On cross-examination he conceded that he was not a land value expert and that his determination as to the value of the trees had no relationship to the value of the land. Judge Singley pointed out for the Court that the expert's testimony had the effect of "completely obscuring the true test — the extent to which the trees enhanced the value of the property taken, an element to be taken into account, as we assume it was, in the experts' opinion of the value of the property condemned."

*Smith* is likewise distinguishable. In that case the trial court "excluded testimony before the jury as to the value of the mineral deposits separate and apart from the value of the land as a whole." As Judge Finan there put it, "the expert witness [had] sought to testify before the jury how he arrived at his evaluation of the mineral deposits by determining what was the unit value of the minerals in place and multiplying that value times the quantity." He said for the Court:

> "We think such testimony is not only highly speculative, but if a jury is to intelligently analyze it without accepting the gratuitous assumptions inherent in such testimony, it requires them to reach separate conclusions on a gallimaufry of collateral issues which are more apt to confuse than enlighten. We think the danger in such testimony was set forth with clarity in *U.S. Ex. Rel. TVA v. Indian Creek Marble Co.,* 40 F. Supp. 811 (D. Tenn. 1941), wherein the Court rejecting such testimony stated:

'Fixing just compensation for land taken by multiplying the number of cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts. This is true because such valuation involves all of the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the existence, but the continued existence of a stable demand at a stable price. It assumes a stable production cost and eliminates the risks all business men know attend the steps essential to the conduct of a manufacturing enterprise It eliminates the possible competition of better materials of the same description and of the possible substitution of other and more desirable materials produced or possible of production by man's ingenuity, even to the extent of rendering the involved material unmarketable. It involves the assumption that human intelligence and business capacity are negligible elements in the successful conduct of business. It would require the numeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation. No man of business experience would buy property on that theory of value.

'Values fixed by witnesses on such a basis are practically worthless, and would not be accepted.' *Id.* at 822." *Id.* at 160-61.

* * *

"The meaning which we extract from the cases representing the majority view is that, the expert witness may definitely take into consideration as one of the factors in reaching his evaluation of the land as a whole the quantity and quality of the minerals present, and the value which they give to the land considered as a whole. However, in making

this appraisal he must not value the minerals separate and apart from the land or aggregate the value of the minerals and the value of the land. Furthermore, it is our view that the expert witness should not utilize the in place unit value, or any unit value of the mineral, multiplied by the quantity in order to arrive at the evaluation of the minerals, as we think the result thus obtained would be too speculative for the reasons which have been heretofore expressed in this opinion." *Id.* at 163.

Fair market value is what the landowner was entitled to receive. That term is defined in Code (1957, 1973 Repl. Vol.) Art. 21, § 12-106 (a) as the "price as of the valuation date for the highest and best use of such property which a seller, willing but not obligated to sell, would accept for the property, and which a buyer, willing but not obligated to buy, would pay therefor," excluding and adding factors not here applicable.

In order to form an opinion as to fair market value of a tract of land, an expert must place himself in the position of such a buyer and seller. Indeed, that is precisely what a jury must do in order for it to fix damages in an eminent domain proceeding. No one parcel of land is exactly the same as another. Each parcel is unique. Nevertheless, a potential developer of a tract such as this, in order to determine its fair market value, would first work out what he conceived to be the value per acre of an ideal piece of clear land. Then, inevitably, he would make a number of additions to and subtractions from that ideal price in his effort to ascertain the fair market value of any given tract. If there were buildings on the land of no possible use to him in his development, he certainly would subtract from his ideal value the cost of demolition of those buildings and the cost of clearing the site. If substantial grading of a site were necessary, then obviously this potential developer would take that cost into consideration in his determination of value. He would look more favorably upon soils known by him to be capable of bearing the weight of the buildings he

contemplated erecting than soils known by him to require pilings for foundation purposes. If the tract were covered with timber, he would deduct from his ideal price per acre the cost of clearing the land in order to render the site ready for building. He undoubtedly would take into consideration the sum or sums he might expect to derive from the sale of that timber, dependent upon whether it had a value merely for pulpwood, whether it had a value for piling, whether it had a value for sawtimber, or whether the potential was for a combination of the three. He conceivably would be prepared to pay more for a tract covered with large, old growth timber, simply because of the revenue he might reasonably expect to derive from it. Likewise, an owner, in setting his sale price, would take into consideration the amount which he thought he might obtain from the sale of timber. If he owned two parcels of land of equal size, equally good location and equally favorable terrain, one of which was covered with scrub pine and the other with good timber for piling, he would expect to sell at a higher price the tract with the potential piling. These are not mere add-on factors, as was the case in *Old Farm Swim Club*, but elements to be considered in reaching a conclusion as to value. We are of the opinion that the concept expressed by the expert of value as a result of the use of the condemned land between its acquisition by a potential purchaser and the beginning of construction by such purchaser is no new concept, but reflects an element of his opinion in regard to fair market value analogous to the ones we have mentioned.

In *Brack v. M. & C. C. of Balto.*, 125 Md. 378, 93 A. 994 (1915), our predecessors said:

> "The rule is that the market value of the land is to be estimated with reference to the uses and purposes to which it is adapted, and that any special features which may enhance its marketability may properly be considered." *Id.* at 381.

To like effect *see M. & C. C. of Balto. v. Carroll*, 128 Md. 68, 73, 96 A. 1076 (1916).

In *State Roads Com. of Md. v. Novosel*, 203 Md. 619, 102 A. 2d 563 (1954), the State complained relative to an appraisal which the State said should have been excluded because it was based upon business profits. Chief Judge Sobeloff there said for the Court:

"The appellant concedes that it is proper to consider profits in computing damages from the taking of business property, but urges that profits should not be permitted to be the sole or principal consideration.

"In the condemnation of an interest in land the law is careful to avoid the capitalization of profits derived from a business occupying such land; for that which is being taken and for which compensation is due is the land, and not the business. Business profits, it is well recognized, are no sure test of land value for they depend not only on location but on other factors; the same location may be fruitful of profit to one and not so to another. This does not mean, however, that in determining the value of the land no consideration is to be given to its productive capacity which, in such circumstances as are present in this case, has an important bearing on value. 4 *Nichols on Eminent Domain* (3rd Ed.), Sec. 12.3121 [1]; 5 *Nichols*, Sec. 19.3 [1], and [4]; 1 *Orgel on Valuation under Eminent Domain* (2nd Ed.), Sec. 164.

"As a practical matter, a prospective purchaser would hardly fail to consider whether or not the business conducted on the premises had proved profitable, for this would be a measure of the desirability of the location, if not to him then to other purchasers. The precise weight to be accorded to this factor is a matter of judgment on which experts may differ, and of this the jury is the final judge. In this case we find that Mr. Bandiere did inquire into the productivity of the premises, and particularly into the question of business profits, although in his testimony he was not permitted to

give the figures. He did not, however, confine himself to profits for he testified, 'I have made several visits to the property and measured the value of that type of business to the location with respect to vehicular traffic, the type of highway, the fact that the highway is a connecting link and is what has now become an eastern coastal highway from Maine to Florida; I have considered the income of the lease; I have studied volumes of business, profits therefrom; I have studied the processes through which you evaluate leases and arrive at conclusions.'

"With the increasing vogue of leases of business property reserving rentals computed on a percentage of the volume of business transacted by the tenant, it would be artificial and illusory to reject an expert opinion of rental value that takes into account the volume of business which experience has shown a particular piece of property is capable of producing; and, of course, the resulting profits may be, if anything, even more pertinent to the question of value. We find no basis for the objection . . . to the testimony of the expert . . . ." *Id.* at 623-24.

To like effect *see Lustine v. State Roads Comm.*, 217 Md. 274, 280, 142 A. 2d 566 (1958).

In *State Roads Comm. v. Halle*, 228 Md. 24, 178 A. 2d 319 (1962), the Court held the estimate of development costs was a proper factor to be considered by the jury in determining the fair market value of the property taken, and the injury, if any, to the remaining property of the landowner. In that opinion Judge Prescott said for the Court:

"Of course, there has never been evolved a method by which the value of land can be computed with accuracy and certainty. Even immediately after a cash sale has been consummated and the purchase price paid to the seller, that purchase price represents the value of the land to the seller

when he sold it; but the value of the land to the new owner — whether he will sustain a loss, obtain an equal price therefor, or realize a profit — is something that cannot be definitely stated until there is another sale. As a necessary consequence, it follows that the triers of fact in a condemnation case, who are called upon to fix the fair market value of the land taken and consequential damages, if any, to that remaining in the owner, must estimate as accurately as they can what that fair market value is. Experience has demonstrated that there are many factors that aid in determining such value with reasonable definiteness, and Courts have long recognized that the triers of fact frequently can be aided by the opinions of persons, who, because of their special, peculiar or technical knowledge or experience, are particularly well qualified to estimate and calculate land values with reasonable accuracy." *Id.* at 28.

The problem here is similar to that which would exist in the matter of vegetable growth. In 4 Sackman, *Nichols on Eminent Domain* § 13.21 (3d ed. 1971), it is stated:

"[T]he value of all vegetable growth upon land taken by eminent domain may be considered insofar as the existence of such growth has a bearing upon the enhancement in market value of such land. Conversely, the rule has been stated that such growth cannot be separately evaluated independently of the value of the land. Nevertheless, the value of crops and trees has been held relevant, although potential profits therefrom have been excluded." *Id.* at 13-86 — 13-90.

The trial judge properly evaluated the situation when he said in ruling upon this evidence:

"It indicates to me that what is being done here, or the substance of the testimony of this expert is not to add on top of the highest and best use or fair

market value as determined by the highest and best use, an amount equal to the income, but rather that in determining the current fair market value, the witness has looked at not only the highest and best use, but has considered that that is deferred to some time in the future and has, therefore, considered interim uses of the property in determining what a reasonably prudent purchaser in the marketplace would pay for the property.

"It seems eminently reasonable to the Court that a prudent purchaser would want to have information, including financial data, on expenses and income and capital improvements for any such interim use before he decided whether to buy the property, although the only real long range or moderately short range objective was for a completely different use.

"It may be a tax carrier, and certainly it enters into a consideration of current fair market value.

"I don't understand that that is adding on top of current fair market value. It is rather an ingredient of current fair market value as, indeed, is the potential highest and best use.

"They are separate, not mutually exclusive ingredients going into make up current fair market value.

"As I understand the testimony of this witness, implicit in his testimony is, he considers this to be good appraisal practice. I think that is sufficient."

No objections are raised before us to the instructions to the jury. If we were to assume *arguendo* that the jury was not properly instructed, the point is not before us and therefore cannot be considered. We note, however, that the jury was specifically instructed:

"I would advise you further that this matter of income or capitalization of income, by the definition I have given you, you will see is not to be added on top of fair market value.

> "It is to be considered if you find it an appropriate consideration in determining what the fair market value is as of today. So it is not in addition to, but a part of the determination of fair market value of the land."

That instruction was consistent with our conception of the law.

In this case it is obvious that the jury in its deliberations and its determination of value did not merely accept, without question, the testimony of the landowner's expert, since the jury verdict of approximately $24,000 per acre was much closer to the expert's adjusted unit average for comparable sales of $23,250 per acre than to his total value of $27,500 per acre, which latter figure rested in part upon his reasoning relative to the disputed value attributable to income from the land pending final development. While it may be that the expert witness might have been wise to have expressed himself in a somewhat different fashion in giving the bases for his opinion as to value, we do not find that the trial judge in this case abused the discretion lodged in him when he permitted the evidence to come before the jury and then refused to strike it out, since it is obvious that the expert in offering his opinion as to the fair market value of the land in question was considering "special features which [might] enhance its marketability" in his evaluation of the whole.

*Judgment affirmed; appellant to pay the costs.*