626 A.2d 997

KEENE CORPORATION, INC.

v.

**Daniel HALL, et ux.**

**No. 236, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

July 1, 1993.

646

Julia K. Evans (F. Ford Loker and Whiteford, Taylor & Preston, on the brief), Baltimore, for appellant.

Joseph A. Vansant (Law Offices of Peter G. Angelos, on the brief), Baltimore, for appellees.

Argued before GARRITY, DAVIS and MOTZ, JJ.

MOTZ, Judge.

In October 1988, appellees, David Hall, a laborer at the Bethlehem Steel Sparrows Point Steel Mill from 1936 to 1939 and at the Bethlehem Steel Sparrows Point Shipyard from 1940 to 1976, and his wife, Henrietta, filed this action in the Circuit Court for Baltimore City against various manufacturers or providers of asbestos products and their successors, including appellant, Keene Corporation. The Halls alleged, *inter alia,* product defect and negligence and claimed compensatory and punitive damages. Their case was consolidated with four others and tried for four and one half weeks before a jury. The jury awarded the Halls no punitive damages; it did award them $471,323.78 in compensatory damages ($466,000 of which was for non-economic damages) against Keene, Owens–Illinois, Inc. and the Manville Asbestos Disease Compensation Trust Fund. Verdicts in favor of other plaintiffs were also returned but, due to set-offs from prior settlements, no other judgments against Keene were entered. Accordingly, no other plaintiffs are appellees here; moreover, no other defendant

has appealed. On appeal, Keene raises five issues, which we have reordered, but not reworded, as follows:

1. Whether the trial court erred in permitting Dr. Gerrit Schepers to testify upon scientifically unsound medical diagnostic techniques and resultant opinions in violation of the Frye/Reed Standard.

2. Whether the trial court erred in failing to enter judgment for Keene in that the testimony of Plaintiff's expert witness was insufficient to support a finding of a causal relationship between plaintiff's laryngeal cancer and his exposure to asbestos.

3. Whether the trial court erred in denying Keene's motion for mistrial when plaintiff's counsel during rebuttal argument referred to defendants as corporate liars, mutilators, murderers, and common criminals.

4. Whether the partiality and improper conduct of the trial judge against defendants and their counsel so tainted the proceedings and prejudiced the jury as to warrant a new trial.

5. Whether the errors, omissions and inaudible passages in the trial transcript have so prejudiced Keene's right to appellate review as to require a new trial.

(i)

At trial, the Halls' expert, Dr. Gerrit Schepers, testified that, in his opinion, the cause of Mr. Hall's laryngeal cancer was exposure to asbestos. That opinion was based on several factors, one of which was Dr. Schepers's use of polarized light microscopy (PLM) to identify asbestos fibers embedded in Mr. Hall's tissue at the site of his tumor. Keene asserts that asbestos fibers cannot be identified through the use of PLM on a stained tissue slide and that Dr. Schepers's attempt to do so is a use of PLM that is neither reliable nor generally accepted. Accordingly, Keene claims that permitting Dr. Schepers to testify as to this use of PLM was error. Specifically, Keene asserts that this testimony violated the standard enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.

1923) and adopted in Maryland in *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978), *i.e.,* a methodology must be "generally accepted as reliable within the expert's particular scientific field." *Reed,* 283 Md. at 381, 391 A.2d 364.

The lower court held a *Frye* hearing on the admissibility of Dr. Schepers's use of PLM on human tissue. Dr. Schepers, who was not the treating physician of any of the plaintiffs but has a background in the study of dust diseases and has testified as an expert for plaintiffs in numerous asbestos cases, explained his use of PLM. He stated that he examines a tissue sample under a microscope, equipped with a polarizing filter. He then rotates the stage which holds the tissue sample until refractive materials become visible. Dr. Schepers testified that, by using a quartz filter, dirt or collagen in the tissue sample are filtered out. By manipulating the power setting on the microscope, Dr. Schepers claims the ability to identify asbestos fibers in human tissue. Dr. Schepers then photographs the polarized material. Plaintiffs proffered that Dr. Schepers's photomicrographs were evidence that asbestos fibers were visible in plaintiffs' tissue samples and confirmed the causation link between asbestos exposure generally and development of the specific malignancy under consideration.

Defendants' expert, Dr. Grover Hutchins, a board certified pathologist, testified that this use of PLM was not generally accepted in the medical community. He explained that although PLM is useful to identify asbestos in inanimate building materials, he knew of no one else who has used PLM, as Dr. Schepers did, to identify asbestos fibers in human tissue and had found "no reference [in research materials] to anyone using this technique." Dr. Hutchins further testified unequivocally that, in his opinion, asbestos fibers cannot be identified through the use of PLM on a stained slide of human tissue. Rather, Dr. Hutchins opined that asbestos fibers could be visualized by using PLM on human tissue samples only after undertaking a very extensive process. One must take the tissue, digest it, accumulate the broken down tissue in a test tube, wash it, resuspend it, put it on a micropore filter and then, and only then, examine it with PLM or some other

method. Alternatively, tissue must be burned away leaving residue, which is only then subject to PLM examination. Even if these elaborate processes are used, Dr. Hutchins stated that PLM is of limited value in examining human tissue because of its inability to differentiate among asbestos fibers and non-asbestos fibers of similar dimension in the tissue. Without digestion or burning, according to Dr. Hutchins, it is impossible to detect asbestos fibers in tissue because there are a number of elements that polarize, creating a confusing image. (It is conceded that Dr. Schepers did not employ the tissue digestion or burning preparations described by Dr. Hutchins.) Dr. Hutchins believed that the material in Dr. Schepers's photomicrographs, identified as asbestos by Dr. Schepers, was actually collagen. Dr. Hutchins cited and discussed two scientific articles as supporting his opinion that Dr. Schepers's use of PLM was neither reliable nor generally accepted in the scientific community.

Dr. Frank Haig, a professor of theoretical physics, also testified as an expert for the plaintiffs. Dr. Haig reviewed Dr. Schepers's deposition testimony and his photomicrographs and stated that Dr. Schepers's methodology was theoretically possible, in that pure and uncoated asbestos fibers have a known refractive that would allow visualization by PLM. Dr. Haig asserted that the underlying "physical principles were very well known, very well accepted" but that he did not know if PLM was generally used to detect asbestos fibers in human tissue and further that he did not know of any other doctor who had utilized PLM in this way to detect the presence of asbestos fibers in human tissue. Furthermore, he could not offer any scientific literature in which others had used PLM as Dr. Schepers did.

Dr. Schepers himself was also unable to name any other doctors who had employed PLM as he had. When asked by the trial court whether other researchers utilized the same technique as he did in this case, Dr. Schepers replied: "I can't answer for what other people don't know" and "other people use other methods." He referred to "institutes" in Germany and England that had published articles on this use of PLM.

No book or article from these "institutes," however, was introduced as evidence at the *Frye* hearing; indeed, at that hearing, Dr. Schepers did not name even one author or article supporting his use of PLM.

At the conclusion of the *Frye* hearing, the trial court stated:

both [of plaintiff's] witnesses and Dr. Hutchins, and if I haven't read it, but they say the article as well, says it [PLM] just isn't a technique that's been used.

Nevertheless, the trial court decided

... to let it in. I have a lot of problems, as I expressed. The basic underlying technique is an accepted one, the polarized light and the phase contrast are accepted ways of bringing up the invisible. I have testimony from defendants' expert that it can't be done. I have a technique that hasn't been done according to—but I do not believe that the fact that it hasn't been done means that it's an improper technique under the *Frye* standard.

I really am not at all convinced that this is a *Frye*-type problem. If I were, I would be more conducive to the defendants' arguments, but I think what has happened here is that the plaintiffs' expert has used accepted things to bring about results that aren't accepted, that there is no *Frye* problem as such, and that the only answer to whatever effect Dr. Schepers' testimony will have is for the defendants to bring back Dr. Hutchins or whoever else they care to bring to try to convince the jurors that what Dr. Schepers will tell them is asbestos fiber either isn't asbestos fiber or that there's no way he could identify it as such. So I'm going to let it in.

■ Initially, the Halls assert that the *Frye–Reed* rule is inapplicable here for two reasons. First, they claim that the *Frye–Reed* standard is inapplicable in Maryland in civil cases. Second, they argue that, even if applicable in civil cases, *Frye–Reed* is "only appropriate as a test of novel scientific principles or techniques, not the application of those techniques in a specific case."

For the first argument, the Halls rely on three cases: *Sabatier v. State Farm Mutual Automobile Ins. Co.*, 323 Md. 232, 592 A.2d 1098 (1991); *Myers v. Celotex Corp.*, 88 Md.App. 442, 594 A.2d 1248 (1991), *cert. denied*, 325 Md. 249, 600 A.2d 418 (1992) and *Haines v. Shanholtz*, 57 Md.App. 92, 468 A.2d 1365, *cert. denied*, 300 Md. 90, 475 A.2d 1201 (1984). None hold that the *Frye–Reed* test is inapplicable in civil cases. *Sabatier* involved a dispute as to whether thermography was a "necessary and reasonable" PIP expense, not whether thermography was an established test so its results could be considered as evidence at a trial. In *Sabatier*, the Court of Appeals did remark, in passing, that in *Reed*, it adopted the view "that *Frye* was deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence in *criminal* cases based upon new scientific principles." 323 Md. at 249, 592 A.2d 1098 (emphasis added). That, of course, is the effect of *Reed*. There is nothing in *Reed*, or *Sabatier*, however, that indicates that the *Frye–Reed* standard is confined to criminal cases. Moreover, just a sentence before the above passing reference, the *Sabatier* court noted:

> After careful review of the voluminous record in this case, we conclude that the *Frye–Reed* standard of general acceptability, *while providing a helpful framework for assessing the admissibility of the results of a diagnostic procedure*, is a standard more stringent than the legislature intended when, in enacting § 539 [of Art. 48A, Maryland Code (1991 Repl.Vol.) ], it formulated the "necessary" and "reasonable" test for reimbursement for medical services.

323 Md. at 249, 592 A.2d 1098. (emphasis added). This language strongly suggests that the *Sabatier* court regarded the *Frye–Reed* standard as fully applicable in appropriate civil cases, *i.e.*, when "assessing the admissibility of the results of a diagnostic procedure."

*Myers* and *Haines* are similarly inapposite. In the latter, we simply held that the *Frye–Reed* rule did not apply to the reliability of genetic testing for establishing paternity because the General Assembly had expressly recognized its reliability for this purpose in art. 16, § 66G of the Maryland Annotated

Code, presently codified at Md.Code Ann., Fam.Law § 5–1029 (1991). *See Haines,* 57 Md.App. at 97–98, 468 A.2d 1365. In *Myers,* another asbestos case, we held that the trial court erred in assertedly applying the *Frye–Reed* test to strike Dr. Schepers's testimony as to how asbestos fibers caused cancer. 88 Md.App. at 455, 594 A.2d 1248. We pointed out that the *Frye–Reed* rule "generally applies to the admissibility of evidence based upon novel scientific techniques or methodologies" but not to "medical opinion evidence which is not 'presented as a scientific test the results of which were controlled by inexorable, physical laws.' " 88 Md.App. at 458–459, 594 A.2d 1248 (quoting *State v. Allewalt,* 308 Md. 89, 98, 517 A.2d 741 (1986)). Tellingly, the Halls do not assert that the case at hand is one, like *Myers,* in which Dr. Schepers is simply stating his expert medical opinion. Rather, they at least implicitly concede that here, unlike *Myers,* Dr. Schepers's opinion is based on a scientific technique controlled "by inexorable, physical laws."

Thus, *Sabatier, Haines,* and *Myers* do *not* hold, or even imply, that the *Frye–Reed* test is inapplicable in civil cases. Moreover, the year after issuing *Reed,* the Court of Appeals in *Thompson v. Thompson,* 285 Md. 488, 497, 404 A.2d 269 (1979), *appeal dismissed,* 444 U.S. 1062, 100 S.Ct. 1002, 62 L.Ed.2d 745 (1980), remarked that because the *Frye–Reed* rule had not been complied with, *i.e.,* no evidence was adduced "showing that this technique is sufficiently established to have gained general acceptancy in its particular field," certain evidence could not be considered in a civil case.[1] Numerous other jurisdictions have similarly found the *Frye* rule applica-

---

1. The evidence at issue was a blood test to demonstrate paternity. In 1982, three years after the Court held in *Thompson,* that evidence as to this "blood testing technique" would only be admitted if it complied with the *Frye–Reed* rule, the General Assembly amended art. 16, § 66G of the Maryland Code. As amended, that statute provides that blood test results can be utilized in paternity cases, in certain circumstances. *See* Fam.Law § 5–1029 (formerly art. 16, § 66G). Two years later, in *Haines,* we held this legislative amendment eliminated the need for blood test evidence to pass the *Frye–Reed* test. *See Haines,* 57 Md.App. at 97–98, 468 A.2d 1365.

ble in civil cases. *See, e.g., Barrel of Fun, Inc. v. State Farm Fire & Cas. Co.,* 739 F.2d 1028, 1031 (5th Cir.1984); *Windmere, Inc. v. International Ins. Co.,* 105 N.J. 373, 522 A.2d 405, 407 (1987); *Neises v. Solomon State Bank,* 236 Kan. 767, 696 P.2d 372, 375–376 (1985); *Huntingdon v. Crowley,* 64 Cal.2d 647, 51 Cal.Rptr. 254, 260, 414 P.2d 382, 388 (1966); *Puhl v. Milwaukee Auto. Ins. Co.,* 8 Wis.2d 343, 99 N.W.2d 163 (1959) (cited in *Reed,* 283 Md. at 382–383, 393 A.2d 364); *Kluck v. Borland,* 162 Mich.App. 695, 413 N.W.2d 90, 91 (1987); *Burkett v. Northern,* 43 Wash.App. 143, 715 P.2d 1159, 1160 (1986); *Cameron v. Knapp,* 137 Misc.2d 373, 520 N.Y.S.2d 917, 918 (N.Y.Sup.1987); *D'Arc v. D'Arc,* 157 N.J.Super. 553, 385 A.2d 278, 281 (1978) (cited in *Reed,* 283 Md. at 384, 391 A.2d 364). Accordingly, there is no merit to the Halls' suggestion that the *Frye–Reed* rule is inapplicable here because this is a civil case.

■ The Halls' alternative argument, which appears to be the basis of the circuit court's decision to admit the PLM evidence, is that the *Frye–Reed* standard is inapplicable here because this case involves not "novel scientific or techniques" but the "application of those techniques." The only basis proffered by the Halls for this argument is the following discussion in the *Reed* opinion:

"[E]xperts may disagree as to the application of a technique, or as to the results of that application, *but they do not generally question that the technique is capable of producing the results claimed.* For instance, it is common knowledge that psychiatric diagnoses are often at odds with each other, and it is easy to picture experts disputing whether two writing samples came from the same hand. It is much more difficult to imagine experts disputing whether psychiatric diagnoses or handwriting identifications are possible with any significant degree of reliability. Yet this is precisely the nature of the voice print dispute; experts question the capability of the process itself, not just the results of its application."

283 Md. at 397–98, 391 A.2d 364 (emphasis added by *Reed* court) (quoting, Comment, *The Voiceprint Dilemma: Should Voices Be Seen and Not Heard?*, 35 Md.L.Rev. 267, 280 n. 79 (1975)). In this explanation, the distinction is simply being drawn between a new scientific technique, which must pass the *Frye* test, and application of an established technique, which need not necessarily pass the *Frye* test.

The Halls, however, confuse application of an established technique for the purpose for which the technique was designed with application of the technique for another purpose, one different from that for which it was designed. If the reliability of a technique for a specific purpose has been established, the application of that technique in a particular case is not subject to the *Frye* rule, as the *Reed* court explained in the above quoted passage. On the other hand, the mere fact that a technique is established as reliable for one purpose does not mean that its application for an entirely different purpose escapes examination under the *Frye* test. For example, if an analysis is recognized as valid for identifying handwriting, its application to analyze particular handwriting need not meet the *Frye* test but if an analysis previously recognized as reliable to analyze handwriting is used to analyze fingerprints, it would have to meet the *Frye* test in order to be admitted. Thus, time and again, the application of an arguably accepted technique for an entirely new purpose has been subjected to the *Frye* analysis, and held not generally accepted in the relevant community, and so inadmissible. *See, e.g., United States v. Tranowski,* 659 F.2d 750, 755–57 (7th Cir.1981) (expert astronomer's opinion, as to date of photograph, should have been excluded when based in part on use of a sun chart, which, although previously used to measure the height of lunar mountains, had never before been used to date a photograph); *United States v. Kilgus,* 571 F.2d 508, 510 (9th Cir.1978) (expert testimony inadmissible because based on the forward looking infrared system, which, although previously used for *generic* identification, was not yet generally accepted for *unique* identification); *United States v. Brown,* 557 F.2d 541, 557–58 (6th Cir.1977) (expert opinion as to hair analysis

inadmissible because based on ion microscopic analysis, which, although previously used to trace elements in inanimate objects, was not yet generally accepted to trace elements on "organic matrices").

In sum, neither of the grounds asserted by the Halls for finding the *Frye–Reed* test inapplicable here has merit.[2] Accordingly, we turn to the question of whether the PLM evidence complied with this test. As the proponent of this evidence, it was the Halls' burden at the *Frye* hearing to demonstrate that the PLM evidence was "generally accepted as reliable within the expert's particular scientific field." *Reed*, 283 Md. at 381, 391 A.2d 364. In meeting this burden they offered only the testimony of Dr. Schepers and Dr. Haig. The former explained how he assertedly used PLM to visualize asbestos fibers in human tissue and that this method was used in German and English "institutes;" the latter opined that this use of PLM was theoretically possible. Neither of the Halls' experts testified that this use of PLM was "generally accepted as reliable" within his "particular field." Indeed, Dr. Haig conceded he had never used PLM in this way. Keene's expert, Dr. Hutchins, expressly testified that: (1) this use of PLM was not reliable—asbestos fibers cannot be identi-

---

**2.** The federal courts have recently discarded the *Frye* rule as too rigid and unworkable. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See also United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir.1985); Paul C. Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, A Half–Century Later*, 80 Colum.L.Rev. 1197 (1980). Those courts that have rejected the *Frye* rule have adopted instead an *ad hoc* balancing test under Fed.R. of Evid. 403 or its state equivalent. *See, e.g., United States v. Baller*, 519 F.2d 463, 466 (4th Cir.) *cert. denied*, 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975). Even if a similar balancing test was adopted as the law of Maryland—and there is nothing in Maryland case law from *Reed* to *Sabatier* that indicates that the Court of Appeals is considering such a move—in order to be admissible scientific evidence still would have to be reliable, *i.e.*, "a demonstrable, objective procedure for reaching the opinion and *qualified persons who can either duplicate the result or criticize the means by which it was reached, drawing their own conclusions from the underlying facts.*" *Baller*, 519 F.2d at 466. (emphasis added). The PLM evidence at issue here does not even meet this standard.

fied through the use of PLM on a stained tissue slide; (2) this use was not generally accepted in the relevant scientific community; and (3) no one else had used PLM in this way to identify asbestos fibers in human tissue. Keene offered two articles to support Dr. Hutchins's opinion that PLM was not generally accepted as reliable as used by Dr. Schepers. Dr. Schepers, although asked, was not able to name a single doctor that used his method or a single publication that supported its use. This was the sum total of the evidence admitted at the *Frye* hearing.

■ The Halls' argument that this evidence was sufficient to establish the admissibility of this use of PLM as generally accepted in the relevant scientific and medical community rests entirely on their claim that "plaintiffs' expert witnesses were better able [than defendants' expert] to comprehend and understand the process at issue and form a judgment about it." There is nothing in the record that supports the claim that the Halls' experts were more knowledgeable than Dr. Hutchins. Moreover, even if Dr. Schepers and Dr. Haig are the persons in the entire country best suited to evaluate this use of PLM, in order for it to be a basis for their expert opinion at trial in Maryland, it must be "generally accepted as reliable within [their] ... field," *ergo*, Dr. Schepers cannot be the only person who advocates the use of PLM in this way. *See Reed*, 283 Md. at 398–399, 391 A.2d 364 (expressly rejecting finding that general acceptance means acceptance among those "directly knowledgeable through work, utilization of the techniques, experimentation and so forth" and not the broad, relevant, general scientific community). *See also Kropinski v. World Plan Executive Council*, 853 F.2d 948, 957 (D.C.Cir. 1988) (if no evidence of a significant following, no evidence of general acceptance); *United States v. Kozminski*, 821 F.2d 1186, 1201–02 (6th Cir.1987), *aff'd*, 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988) (first presentation of theory is evidence that it has not gained general acceptance); *Brown*, 557 F.2d at 557–58 (unsupported assertions by proponent's experts do not establish general acceptance). Accordingly, because the evidence offered by the Halls at the *Frye* hearing

demonstrated that only Dr. Schepers used PLM to identify asbestos fibers in undigested human tissue and not that any one else used PLM in this way, it failed to demonstrate that this use of PLM was generally accepted in the relevant scientific and medical community.

Our independent research, *see Reed* 283 Md. at 380–381, 391 A.2d 364, confirms this view. Although, as indicated within, Dr. Schepers has testified in numerous asbestos cases, in none of the judicial opinions involving those cases is there any indication that he based his opinion on the PLM technique at issue here or testified as to this use of PLM. *See Flannigan v. GAF Corp.,* 904 F.2d 36 (text in Westlaw) (6th Cir.1990) (Dr. Schepers testified as to state of the art knowledge as to dangers of asbestos); *Jackson v. Johns–Manville Sales Corp.,* 781 F.2d 394 (5th Cir.), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986) (Dr. Schepers identified as one expert); *Ecklund v. GAF Corp.,* 766 F.Supp. 384, 386 (W.D.Pa.1991) (Dr. Schepers opined asbestos fibers can be invisible); *Musser v. Bell Asbestos Mines, Ltd.,* No. 81–3929, 1986 WL 2374 (E.D.Pa.1986) (Dr. Schepers identified as expert who told asbestos industry members in 1950s of dangers of asbestos); *Diem v. Bell Asbestos Mines, Ltd.,* No. 81–1271, 1985 WL 2806 (E.D.Pa.1985) (Dr. Schepers identified as expert who told Asbestos Textile Clinic in 1954 that asbestos caused cancer); *Goodbar v. Whitehead Brothers,* 591 F.Supp. 552 (W.D.Va.1984), *aff'd,* 769 F.2d 213 (4th Cir.1985) (Dr. Schepers testified as to state of the art knowledge of dangers of asbestos); *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992) (same); *Brisboy v. Fibreboard Corp.* 429 Mich. 540, 418 N.W.2d 650 (1988); (Dr. Schepers testified plaintiff's cancer caused by asbestos); *Myers,* 88 Md.App. at 455, 594 A.2d 1248 (same); *Welch v. Keene Corp.,* 31 Mass. App.Ct. 157, 575 N.E.2d 766 (1991) (Dr. Schepers testified as to state of the art and failure to warn); *Cocco v. A.C. & S. Co., Inc.,* No. 86C–DE–188, 1990 WL 251405 (Del.Super.Ct.1990) (Dr. Schepers testified as to value of cardiac exercise test in determining pulmonary disease).

Moreover, our research has not led us to even one case in which evidence as to the use of PLM to identify asbestos fibers in *human tissues* was accepted—or even offered. The only use made of PLM in asbestos cases appears to be one that was described by Dr. Hutchins at trial, *i.e.*, identification of asbestos in *building materials. See Wiley v. Southeast Erectors, Inc.*, 573 So.2d 946, 949 (Fla.Dist.Ct.App.), *cert. denied*, 582 So.2d 623 (1991) (chemical properties of Blaze Shield, a fire proofing protective coating, were determined "by analysis with polarized light microscopy"); *210 East 86th Street Corp. v. Combustion Engineering, Inc.*, 821 F.Supp. 125 (S.D.N.Y.1993) ("a combination of polarized light microscopy ("PLM"), x-ray diffraction ("XRD"), scanning electron microscopy ("SEM") and analytical transmission electron microscopy ("TEM") to determine the constituent elements of each sample" of defendants' building products); *Massachusetts v. UNR Industries, Inc.*, No. 91–C–1895, 1991 WL 76484 (N.D.Ill.1991) ("samples [from buildings owned by plaintiffs] were analyzed by an accepted method known as polarized light microscopy (PLM)").

■ Apparently, PLM has been accepted as a method for identifying asbestos in building materials. *See Roseville Plaza Ltd. Partnership v. U.S. Gypsum Co.*, 811 F.Supp. 1200, 1207 n. 13 (E.D.Mich.1992) (citing 40 C.F.R. § 61.141 (1992)). *See also UNR Industries*, 1991 WL 76484. This does not necessarily mean, however, that PLM is an accepted method for identifying asbestos in human tissue. *See Brown*, 557 F.2d at 557–58 (ion microscopic analysis that had been used to analyze metals and other inanimate objects held not generally accepted as technique for analyzing human hair.) [3] We are

---

**3.** *Brown* is strikingly similar in many respects to the case at hand. As here, an expert's opinion as to organic material was based on use of a technique formerly only used to test inanimate material, no proffer was made that evidence as to the new use was admitted in any other case, and there was "no published authority" for the new use, indeed, there was nothing to support its admission except "unsupported assertions" of proponent's expert. *See Brown*, 557 F.2d at 557–58. This was held

not scientists but can take judicial notice that inanimate material and tissue from human beings have different properties.

■ Because Dr. Schepers's use of PLM to identify asbestos in undigested human tissue was not demonstrated to be generally accepted in the relevant scientific and medical community, we must reverse the judgment and remand the case for a new trial.

(ii)

Keene contends that a remand is inadequate, that in fact it was entitled to judgment because Dr. Schepers's testimony "was insufficient to support a finding of a causal relationship between [Mr. Hall's] laryngeal cancer and [his] exposure to asbestos." Keene asserts that the Halls had "the burden of proving that: 1) asbestos causes laryngeal cancer and 2) plaintiff's laryngeal cancer was caused by exposure to asbestos" and that the Halls failed in both respects. With regard to both general and specific causation, the Halls relied completely on Dr. Schepers's expert opinion.

■ We note at the outset that although an expert witness must base his opinion on facts in evidence, those facts need not be ascertained by him through physical examination of a patient but rather may be "*facts* contained in reports or examinations by third parties." *Consol. Mech. Contractors v. Ball*, 263 Md. 328, 335, 283 A.2d 154 (1971) (emphasis in original); *State Roads Comm. v. Creswell*, 235 Md. 220, 227, 201 A.2d 328 (1964). An expert may therefore extrapolate from data and facts contained in others' reports and studies in order to form his expert opinion. Just as with any other facts relied upon by an expert in forming his opinion, the facts contained in third party reports or examinations must be "legally sufficient to sustain the opinion of the expert." *State Dept. of Health v. Walker*, 238 Md. 512, 520, 209 A.2d 555

---

to be inadequate to demonstrate general acceptance under the *Frye* test. *Id.*

(1965). *See also Evans v. State,* 322 Md. 24, 34, 585 A.2d 204 (1991). That is, "[t]he facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess." *State Dept. of Health,* 238 Md. at 520, 209 A.2d 555. *See also* 6 Lynn McLain, *Maryland Evidence State and Federal* § 703.1 at 239 (hereinafter, "McLain") (the third party report or examination upon which an expert witness relies must be "sufficiently trustworthy to be reliable and . . . have probative value of its own"). It is the trial court's function to pass on the legal sufficiency of the facts upon which an expert bases his opinion. The jury, on the other hand, decides what weight, if any, to give an expert's opinion. *See Marshall v. Sellers,* 188 Md. 508, 518, 53 A.2d 5 (1947) ("[t]he opinion of an expert witness, the grounds upon which it has been formed, and the weight to be accorded to it are all matters for the consideration of the jury").

With these principles in mind, we turn to the expert opinions offered by Dr. Schepers here. His opinion as to general causation, *i.e.,* asbestos exposure causes laryngeal cancer, was based on certain epidemiological data. It is this evidence to which Keene devotes most of its attention, arguing that it was not legally sufficient to support an expert opinion that laryngeal cancer is caused by asbestos. Dr. Schepers testified that he reviewed eleven epidemiological studies, each of which was performed by different professionals and each of which demonstrated a causal connection between exposure to asbestos and laryngeal cancer. He then summarized the data from these studies and calculated the relative risk of contracting laryngeal cancer after exposure to asbestos. Initially, Dr. Schepers found a 1.6 risk factor; however, because of typographical errors, Dr. Schepers testified that the accurate risk factor was 2.32, a figure which, as Keene concedes, indicates an association between exposure to asbestos and laryngeal cancer. Keene criticizes Dr. Schepers's "sole" reliance on these studies "published from 1963–85" and suggests that Dr. Schepers should have based his opinion on more current studies; Keene complains that Dr. Schepers's use of only

these eleven studies is unduly selective because it avoided "the vast majority of cases" involving laryngeal cancer; Keene contends that Dr. Schepers's opinion should not have been allowed because he incorrectly combined the data from the studies; and Keene vehemently argues that Dr. Schepers reanalyzed the data and this reanalysis was not reliable because it had not been published or otherwise subject to the rigors of peer review.

Dr. Schepers was entitled to base his expert opinion on these epidemiological studies performed by third parties. *See Consol. Mech. Contractors*, 263 Md. at 335, 283 A.2d 154. Keene does not question the validity or reliability of these eleven studies. It does not contend that the results from these eleven studies are untrustworthy or otherwise without probative value, *see* 6 McLain, § 703.1 at 239; rather it only criticizes the manner in which Dr. Schepers used the data from these studies. Dr. Schepers merely summarized the epidemiological studies, studies which concededly showed a causal connection between exposure to asbestos and laryngeal cancer. Thus, contrary to Keene's repeated assertions, Dr. Schepers did not take epidemiological studies, showing no causal relationship between the hazardous material, here asbestos, and the disease, here cancer, and reanalyze those studies to reach an opposite conclusion. Accordingly, all of the cases relied on by Keene in which courts have refused to permit experts to reanalyze epidemiological studies in that way are inapposite. *See, e.g., Brock v. Merrell Dow Pharmaceutical, Inc.*, 874 F.2d 307, 313–15, *modified*, 884 F.2d 166 (5th Cir.1989), *cert. denied*, 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990); *Lynch v. Merrell–National Laboratories*, 830 F.2d 1190, 1195 (1st Cir.1987).

Keene's other arguments as to the epidemiological studies really go to the weight to be given Dr. Schepers's expert opinion rather than to the legal sufficiency of that opinion. *See, e.g., Board of Ed. v. Hughes*, 271 Md. 335, 342, 317 A.2d 485 (1974) (objection that data relied upon was two years old went to the weight of the evidence rather than its admissibility). To rebut Dr. Schepers's testimony, Keene was permitted

to cross-examine Dr. Schepers about his review and analysis of the epidemiological studies and to comment on this opinion during closing argument. *Hughes*, 271 Md. at 342, 317 A.2d 485 (appellant "was in a position to follow up on this [expert opinion evidence] on cross-examination and it did . . . [and the evidence] was available to counsel for comment in their argument to the jury"); *see also*, 6 McLain, § 705.1 at 257. In its cross-examination, Keene attempted to discredit Dr. Schepers's opinion. Keene focused on Dr. Schepers's analysis of the eleven epidemiological studies and suggested to the jury that Dr. Schepers's methodology was flawed in numerous respects. The jury, however, as the ultimate fact finder in this case, was entitled to believe or disbelieve Dr. Schepers's testimony. Moreover, reviewing it in the light most favorable to the Halls, this testimony was sufficient to establish general causation.

■ Dr. Schepers's opinion as to specific causation, *i.e.*, that asbestos caused Mr. Hall's laryngeal cancer, was based on his review of: (1) Mr. Hall's medical records, (2) Mr. Hall's work history (*i.e.*, exposure to asbestos), (3) the eleven epidemiological studies, and (4) the results of PLM on Mr. Hall's tissue samples. Keene challenges the legal sufficiency of each of these bases for Dr. Schepers's opinion. We have already concluded on the one hand, that the PLM evidence did not meet the *Frye–Reed* test and so should not have been permitted to be a basis for Dr. Schepers's opinion and, on the other, that the epidemiological evidence was a proper basis for Dr. Schepers's opinion. As to the two other bases, Keene claims that because Dr. Schepers never examined Mr. Hall or questioned Mr. Hall about his work history, exposure to asbestos, or physical symptoms, Dr. Schepers's expert opinion was thus not based on legally sufficient facts and should not have been admitted. Contrary to Keene's contentions, however, Dr. Schepers was not required to examine Mr. Hall in order to express an opinion regarding what caused Mr. Hall's laryngeal cancer; rather, Dr. Schepers could express an expert opinion based on a review of Mr. Hall's medical records or other records. *See Queen v. Director of Patuxent Institution*, 226 Md. 664, 665, 174 A.2d 351 (1961); *Andrews v. Andrews*, 242

Md. 143, 152, 218 A.2d 194 (1966); *Consol. Mech. Contractors*, 263 Md. at 335, 283 A.2d 154. Thus, Mr. Hall's medical records and work history, like the epidemiological studies, could properly be considered by Dr. Schepers as a basis for his expert opinion.

The remaining question is whether this evidence, Mr. Hall's medical records and work history, and the epidemiological studies, without the wrongly admitted PLM evidence, could provide a sufficient basis for an expert opinion that asbestos caused Mr. Hall's laryngeal cancer.[4] In making this determination, we, again, review the evidence in the light most favorable to the Halls and draw any inferences in their favor. According to Dr. Schepers, Mr. Hall had "a long history of working with asbestos materials under circumstances that would have led to the inhalation of the asbestos[, and] . . . [t]he symptoms that go with asbestosis, shortness of breath and the x-ray signs that match asbestosis." Dr. Schepers also noted the absence of other factors which cause laryngeal cancer, such as cigarette smoking. Fact finders in other cases have concluded that similar evidence (work history of exposure to asbestos, medical history of asbestosis or other symptoms related to asbestos exposure, and epidemiological studies) is sufficient to establish that exposure to asbestos caused the plaintiffs' cancer. *See e.g., Landrigan v. Celotex Corp.*, 127 N.J. 404, 605 A.2d 1079, 1086 (1992) (expert opinion based on examination of work history, medical records, epidemiological studies); *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088, 1095 (1985) (expert opinion based on medical records and epidemiological surveys); *Lee v. A.C. & S. Co., Inc.*, 542 A.2d 352, 355 (Del.Super.Ct.1987) (epidemiological studies properly relied on by medical expert). *See also, In re*

---

4. It is, of course, impossible to predict whether Dr. Schepers's opinion as to the cause of Mr. Hall's cancer would have been, or will be, the same, absent consideration of the PLM evidence. This matter can be probed on retrial. Our role here is to examine whether the non-PLM evidence could constitute a sufficient basis for an expert's causation opinion. Only if it could not would Keene have been entitled to judgment as a matter of law.

*New York Asbestos Litigation,* 738 F.Supp. 66, 69–70 (E.D.N.Y.1990), *aff'd,* 969 F.2d 1424 (2nd Cir.1992) (expert opinion based on work history and medical records); *Burton v. Johns–Manville Corp.,* 613 F.Supp. 91, 93 (W.D.Pa.1985) (same); *Lockwood v. A.C. & S., Inc.,* 109 Wash.2d 235, 744 P.2d 605, 613 (1987) (trial court should consider work history, medical history); *DeCosse v. Armstrong Cork Co.,* 319 N.W.2d 45, 47 (Minn.1982), *limited on other grounds by Regie de L'Assurance Auto. v. Jensen,* 399 N.W.2d 85, 91 n. 10 (Minn. 1987) (expert relied on medical records to determine cause). Accordingly, we believe that this evidence could provide a sufficient basis for an expert's opinion that Mr. Hall's exposure to asbestos caused his subsequent development of laryngeal cancer, and so Keene was not entitled to judgment as a matter of law as to causation.

(iii)

Keene raises three additional claims. We need not address its final argument—that retrial is required because of inaudible passages and errors in the transcript of the videotaped proceedings. When the case is retried, an entirely new transcript will, of course, be prepared. We shall, however, briefly discuss the remaining challenges raised by Keene—to the rebuttal closing argument and the trial court's conduct of the trial—for the guidance of the circuit court and the parties in the event of retrial.

 Keene's complaint about the rebuttal-closing argument of the Halls' counsel is well founded. During rebuttal closing argument, the following ensued:

THE HALLS' COUNSEL: Ladies and gentlemen, there have been a lot of games that the defendants have played throughout the trial, and I submit to you that the reason why they've played some of the games that they have played is basically to distort the truth, to twist the truth, to confuse you. We're finally at the point that we started and hoped we'd reach—the end of the case—and this is what I'd like to call judgment day for these defendants.

And judgment day in another context used in a biblical sense is a day of awakening, a day of reawakening, a day to shed light on things as they really are, and that is what I say that today is for these defendants—judgment day. When we started the case Mr. McLean said he hoped that he'd live to see it through the trial and thank God he's made it to see it through this day—to judgment day.

Judgment day is a day for you to tell these defendants that after you've received the evidence you see them for what they really are, and that is *a bunch of corporate liars, a bunch of corporate mutilators, a bunch of corporate murderers.* You see—

KEENE'S COUNSEL: I object.... Corporate murders? ... I—I move for a mistrial.

THE COURT: Denied. Let's complete the trial please, counsel.

THE HALLS' COUNSEL: [Keene's counsel] said to you in his closing that he used to be a State's Attorney. [Other defense counsel] used to be a State's Attorney. I also used to prosecute cases in this courthouse and these defendants, these corporations—they are no different. *They are no better than a common criminal walking on the streets.*

KEENE'S COUNSEL: I object again. This is outrageous....

THE COURT:—to both of you this is not a criminal trial and I think it's high time the jurors got to determining the issues in the case.

(emphasis added). On appeal, the Halls do not assert that the remarks were proper. They clearly were not. As Chief Judge Wilner recently noted in another civil case in which counsel used improper argument, it is "wholly inappropriate to accuse [the defendant] of 'theft,' or 'stealing,' or 'robbery.' There is no need for snide remarks, pejorative, and unfounded hyperbole or exaggeration, and they should not be permitted. The search for truth, which is supposedly the principal function of a trial, is assisted much more by light than by heat." *Alexander & Alexander, Inc. v. B. Dixon Evander & Assoc.,*

*Inc.*, 88 Md.App. 672, 704, 596 A.2d 687 (1991), *cert. denied,* 326 Md. 435, 605 A.2d 137 (1992). We need not here determine if these improper remarks caused such prejudice as to require a new trial because a new trial is in any event required. We trust, however, that sort of argument will never again be made by the Halls' counsel.

Keene's remaining claim, that the "partiality and improper conduct of the trial judge against defendants and their counsel so tainted the proceedings and prejudiced the jury as to warrant a new trial," is a serious one. We have carefully reviewed the record and conclude that the claim is not entirely without substance. The circuit court did interrupt counsel's questioning of witnesses many times. On some occasions, the trial court appears to have wanted simply to clarify long, repetitious and often technical testimony—that, of course, is entirely proper. On other occasions, however, the court below interjected needlessly. At least once, the court stated, in front of the jury, that it knew "from other sources" some information, arguably helpful to the plaintiffs, about which no plaintiff's witness testified. This had the effect of putting before the jury, with the judge's imprimatur, material for which there was no evidentiary support. It and other interjections also may have suggested to the jury that the trial court favored the plaintiffs over the defendants; if this was done, it is hard to believe that even the normal jury instructions, which were given, would have eliminated the prejudice to defendants.

We recognize that long trials, involving complicated technical issues and numerous plaintiffs and defendants, represented by their respective counsel, test the patience of even the most saintly. We also recognize that while litigants are entitled to a fair trial, they are not entitled to a perfect one; indeed, a perfect trial of the length of this one would appear to be an impossibility. Because retrial is required in any event, we need not here determine if the court's frequent interruptions constituted reversible error. On retrial, however, we caution the trial court to avoid interjections before the jury and caution counsel to focus their questions, so as to eliminate

repetition and obfuscation, and most especially, to avoid argument with the trial court. At least some of the court's interjections were prolonged by defense counsel's argument.

JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY.

COSTS TO BE PAID BY APPELLEES.